IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CV-826-FL

| | | |
|---|---|---|
| LARRY WINSLOWE LEE and SUSAN PROVOST LEE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| CERTAINTEED CORPORATION; FORMOSA PLASTICS CORPORATION U.S.A., sued individually and as parent, alter ego and successor-in-interest to J-M Manufacturing Company and to J-M A/C Pipe Corporation; GENUINE PARTS COMPANY, d/b/a National Automotive Parts Association (a/k/a NAPA); J-M MANUFACTURING COMPANY, INC., sued individually and as parent and alter ego to J-M A/C Pipe Corporation; KAWASAKI MOTORS CORP., U.S.A.; METROPOLITAN LIFE INSURANCE COMPANY; PNEUMO ABEX LLC, sued individually and as successor-in-interest to Abex Corporation and as succesor-in-interest to American Brakeblok; and YAMAHA MOTOR CORPORATION, U.S.A.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) ) | |

This case, originally brought against 23 defendants where the eight above-captioned now remain, comes before the court on motions premised on Rule 56 of the Federal Rules of Civil Procedure separately filed March 10, 2015, on behalf of defendants J-M Manufacturing Company, Inc. ("JMM") (DE 151) and Formosa Plastics Corporation U.S.A. ("Formosa") (DE

148).  The issues raised are ripe for consideration.  For the reasons explained, the court grants defendant Formosa's summary judgment motion, dismissing it from the case, and grants in part and denies in part the partial summary judgment motion of defendant JMM.

## STATEMENT OF THE CASE

Plaintiffs, residents of Wake County, North Carolina, complain of personal injury and loss of consortium, where plaintiff Larry Winslowe Lee ("Larry Lee") was diagnosed with mesothelioma on or about September 13, 2013.  Plaintiffs allege that his condition resulted from exposure to asbestos during his employment as mechanics' helper, maintenance laborer, inspector, construction worker, and salesman, in addition to automotive maintenance work performed on his own personal vehicles and those of his family.

Plaintiffs bring a total of eight claims for relief entitling them, it is alleged, to recover actual and punitive damages, lost wages and special damages.  Five claims are asserted against all defendants with the exception of defendant Metropolitan Life Insurance Company ("MetLife").  With respect to claims against all defendants excluding Metlife, defendants are alleged to have:  1) acted negligently in putting asbestos or asbestos-containing products into interstate commerce (First Cause); 2) breached implied warranties that asbestos materials were of good and merchantable quality and fit for their intended use (Second Cause); 3) acted willfully and wantonly in exposing plaintiff Larry Lee to asbestos (Third Cause); 4)  committed false representation and fraud regarding the dangers of asbestos exposure to plaintiff Larry Lee (Fourth Cause)[1]; and failed to warn plaintiff Larry Lee of the dangers associated with asbestos exposure (Fifth Cause).   In a separate claim, defendant MetLife is alleged to have engaged in a

---

[1]  Plaintiffs' claim for false representation and fraud has been dismissed against defendants Kawasaki Motors Corp., U.S.A. ("Kawasaki"), JMM, Formosa, and Genuine Parts Company ("Genuine Parts").  April 11, 2014 Order (DE 105); January 26, 2015 Order (DE 131); March 10, 2015 Order (DE 141).

conspiracy and to be liable for punitive damages, where, it is asserted, Metlife aided and abetted the negligence and marketing of asbestos-containing products (Sixth Cause). Defendants Formosa and JMM are also the subject of a separate claim premised on conspiracy and punitive damages liability for the manufacture and sale of asbestos-containing products (Seventh Cause). Plaintiff Susan Provost Lee ("Susan Lee") seeks also to recover for her loss of consortium (Eighth Cause).

Defendants deny liability. As noted, a number of defendants have been dismissed from the case.[2] Four of the remaining eight defendants have moved in some fashion for summary judgment.

Defendant JMM's motion is one for partial summary judgment. With reliance on plaintiff Larry Lee's deposition, the deposition of his son, Robert Lee, and order of the United States Bankruptcy Court for the Southern District of New York, as clarified, concerning disposition of certain assets in Chapter 11 proceeding involving Johns-Manville Sales Corporation, Johns-Manville Corporation, and Manville Corporation (collectively, "Johns-Manville"), together with the asset purchase and sale agreement therein referenced, it moves for judgment in its favor on any attempt to hold it liable for plaintiff Larry Lee's alleged work with and around asbestos-cement pipe manufactured by Johns-Manville and plaintiffs' claims for punitive damages. Defendant Formosa seeks entry of judgment in its favor on all claims against it, with reliance on plaintiff Larry Lee's deposition and its responses to plaintiffs'

---

[2] These include: AK Steel Corp.; Briggs & Stratton Corporation; Clow Valve Company; Dana Companies, LLC; Deere & Company; Eckler's Corvette; Ford Motor Company; Grinnell LLC; Hajoca Corporation; Hammer & Steel, Inc.; Honeywell International, Inc.; McWane, Inc.; Pfizer, Inc.; Special Electric Company, Inc.; and Union Carbide Corporation.

interrogatories.  In mounting a vigorous defense, plaintiffs rely on a host of evidentiary materials.[3]

Defendant Genuine Parts seeks partial summary judgment on plaintiffs' third cause of action premised on alleged willful and wanton conduct.  Defendant Pneumo Abex LLC ("Pneumo") seeks to join in these motions by defendants JMM, Formosa, and Genuine Parts.[4] The court will address in successive order(s) defendant Pneumo's stance, which plaintiffs characterize as an improper motion, as well as the partial summary judgment motion filed by Genuine Parts.

Also remaining to be addressed is defendant JMM's motion to strike and for protective order regarding one of the exhibits relied upon by plaintiffs in defense of its motion, which defendant contends is protected by attorney-client privilege, should be stricken from the court's file, and returned or destroyed by plaintiffs.  Without minimizing the significance of the issues therein raised, where no reference is made to that exhibit in deciding JMM's partial summary judgment motion, the court need not now address its motion to strike and for protective order, on which separate order will issue.   The court now turns its attention to the motions of defendants JMM and Formosa squarely before it.

---

[3]  In their replies, defendants JMM and Formosa each lob the same objection in a footnote to all of plaintiffs' exhibits, "to the extent such exhibits are not admissible at trial and therefore not properly before the Court on [JMM's] [Formosa's] motion for summary judgment."  (JMM Reply, 2 n. 1) (DE 173); (Formosa Reply, 1 n.2) (DE 174). Because neither defendant has developed specific argument directed towards a particular exhibit, for purposes of the court's consideration of their respective motions, these objections are overruled.

[4]  In a one sentence "Notice of Joinder" filed the day after expiration of the deadline for filing any motion for summary judgment, defendant Pneumo recites its "adopt[ion] [of] the Motions for Full and Partial Summary Judgment, and Memoranda in Support, filed by other Defendants in this matter, whether they remain in the case at trial or not, and to the extent those Motions are not inconsistent with Pneumo Abex LLC's position and defenses  in this case."  (Notice, 1) (DE 156).

# FACTUAL BACKGROUND

Due to considerable overlap in the allegations and evidence against defendants JMM and Formosa, the court consolidates its discussion of the relevant, uncontested facts below.

A. Defendants' Organization and Operations

Defendant Formosa manufactures chemical plastic raw materials. (Alice Nightingale ("Nightingale") Dep., 8:5-6) (DE 166-10).[5] Defendant JMM manufactures products including pipes made from polyvinyl chloride ("PVC"), polyethylene ("PE"), and high-density polyethylene ("HDPE"). (James Reichert ("Reichert") Dep., 14:12-16) (DE 164-1).[6]

From February 1984 through October 2005, defendant Formosa was the parent of defendant JMM. (Nightingale Dep. 10:6-10). It became sole shareholder of defendant JMM in 1984. (Nightingale Dep. 10:8-13, 24:21-26:1).

Defendant JMM came into existence in 1983, when it obtained assets previously held by Johns-Manville. (Asset Purchase & Sale Agreement, Art. I, § 1.1) (DE 158-8); (Reichert Dep., 16:19-24; 17:8-10; 21:19-22:1; 27:19-28:5). In particular, defendant JMM obtained the PVC pipe division of Johns-Manville. (Asset Purchase & Sale Agreement, Art. I, § 1.1); (Reichert Dep., 16:19-24). In addition to PVC pipe, Johns-Manville also produced asbestos cement pipe, also known as "transite" or "A/C" pipe. (Reichert Dep., 14:22-15:5).

The asbestos cement pipe division of Johns-Manville was sold to J-M A/C Pipe Company ("JMAC"). (Reichert Dep., 16:22-24). A Dun & Bradstreet Report from October 31,

---

[5] Deposition of Nightingale was taken October 6, 2011, in another case. Nightingale testified as the corporate secretary and assistant vice president for the legal division of defendant Formosa, and Formosa's corporate representative. (Nightingale Dep. 7:15-21; 8:11-14).

[6] Deposition of Reichert was taken September 14, 2011, in another case. Reichert testified as the manager of services at JMM's plant in Stockton, California, and as JMM's corporate representative. (Reichert Dep., 12:1-23).

5

1985, states that JMAC's stock "is reportedly 100% owned by Frontier Corp, Liberia and is controlled by FormosaPlasticsGrouop [sic], Taipei, Taiwan." (DE 166-17).

Defendant JMM and JMAC produced a "J-M Policy and Procedure Manual" in April 1986 which defined "J-M" as "[t]he Company, includ[ing] J-M Manufacturing Co., Inc. and J-M A/C Pipe Corporation." (J-M Policy & Proc. Manual, § 102.5) (DE 166-13). The J-M Policy and Procedure Manual further provides that

> J-M is part of Formosa-USA, which in turn is associated with the Formosa Plastic Group. Formosa Plastic Group consists of Nan Ya Plastics, Formosa Plastic Corporation and Formosa Chemical & Fiber; and thirteen other companies as well as Ming-Chi Institute of Technology and Chang Gung Memorial Hospital Foundation. The leadership for FPG is provided by Chairman Y.C. Wang and his family.

(Id., § 104.3).

In the course of obtaining Johns-Manville's PVC pipe division, defendant JMM also obtained Johns-Manville's plants in Denison, Texas, and Stockton, California. (Asset Purchase & Sale Agreement, Art. I, § 1.1(A)); (Reichert Dep., 27:19-28:5). JMAC operated out of the Denison and Stockton plants along with defendant JMM. (Reichert Dep., 17:18-23; 27:19-22). Under Johns-Manville, the Denison and Stockton plants had manufactured PVC pipe and asbestos cement pipe. (Id. 12:24-13:22; 14:22-15:5). The plants continued to manufacture both types of pipe after the turnover, with defendant JMM producing PVC pipe and JMAC producing asbestos cement pipe. (Id., 16:2-6; 17:20-18:6; 26:4-22; 28:1-8); (Def's. Resp. to Interrogs., 8, 10) (DE 164-2). Although defendant JMM did not manufacture asbestos cement pipe, it did sell the asbestos cement pipe manufactured by JMAC. (Reichert Dep., 15:8; 18:17-19:4); (Def's. Resp. to Interrogs. 8) (DE 164-2). JMM also provided purchased raw materials and health and safety services for JMAC employees. (Reichert Dep., 19:5-21).

6

When defendant JMM obtained the Denison plant, tens of thousands of pieces of asbestos cement or transite pipe remained in inventory. (Lewis Armstrong ("Armstrong") Decl., ¶ 7) (DE 164-9).[7] The Johns-Manville pipe became intermingled with newly manufactured JMAC pipe. (Id., ¶ 8). Furthermore, even after 1983 the asbestos cement pipe produced by JMAC and sold by JMM continued to bear the names of "Johns-Manville" and "J-M". (Id., ¶ 5); (Armstrong Dep. 31:18-22) (DE 164-10).[8] JMAC ceased production of the asbestos cement pipe at the Stockton plant in 1987, and at the Denison plant in 1988. (Def's. Resp. to Interrogs., 10).

As noted above, Nightingale, corporate secretary and assistant vice president for Formosa's legal division, testified in another case in 2011. Plaintiffs rely on that deposition wherein Nightingale identified a number of persons who had worked for defendant JMM and/or JMAC "up through 1988," and who also had worked for defendant Formosa. (Nightingale Dep., 48:11-21). Y.C. Wang ("Wang"), chief executive officer of JMM from 1983 to at least 1986, was also chairman of the board of directors at Formosa "at some point" before 1988 and extending until at least 1988. (Nightingale Dep., 49:20-50:6); (J-M Policy and Procedure Manual, § 104.3); (Lists Officers & Directors of JMM and JMAC) (DE 166-14). Wang was the first stock owner in JMAC. (Memo. & Stock Certificate) (DE 166-16).

W. Wong ("Wong"), a director at Formosa "at some point prior to 1988," was also president of JMAC and defendant JMM from 1984 to at least 1986 (Nightingale Dep., 53:9-54-14); (Lists of Officers & Directors of JMM & JMAC). Mas Kuo ("Kuo"), treasurer of JMAC and defendant JMM from 1984-1985, had also been an employee of defendant Formosa, although Nightingale did not specify his position at Formosa. (Nightingale Dep., 54:15-55:5);

---

[7] Armstrong worked at the Denison plant at the time of the ownership turnover in 1983. (Armstrong Decl., ¶ 2).

[8] Defendant JMM asserts the pipe it sold "was never labeled 'Johns-Manville.' " (Memo. In Supp., 5) (DE 158). However, it cites to no evidence in the record to support this assertion.

(Lists of Officers & Directors of JMM & JMAC). Charles McAuliffe ("McAuliffe") was a director at JMAC from 1982-1983, vice president at defendant JMM in 1984, and general counsel for defendant Formosa from approximately 1982-1991. (Nightingale Dep. 55:17-56:19); (Lists of Officers & Directors of JMM & JMAC). Peter Pan ("Pan") was vice president of defendant JMM from 1983-1984 and acting secretary of JMAC in 1983, and a Formosa employee "before 1988," although Nightingale did not specify his title. (Nightingale Dep., 50:18-51:5) (Certificate of Corporate Resolutions Designating Mercantile Nat'l Bank at Dallas as Depository and Granting Authorizations) (DE 166-19).

Richard Chi ("Chi"), who had "at some point before 1988" been president of Formosa, was president of defendant JMM and JMAC from 1983-1984. (Nightingale Dep., 50:7-16); (Lists of Officers & Directors of JMM & JMAC). He had authority to sign checks on a JMAC bank account in 1983. (JMAC Account Card for Mercantile Nat'l) (DE 166-20). Andrew Yu ("Yu"), secretary of JMAC from 1983 to at least 1986, and a JMAC director those same years, had also been employed in the sales department of Formosa "at some point prior to 1988." (Nightingale Dep., 52:25-53:6); (Lists of Officers & Directors of JMM & JMAC); (Consent of Directors of JMM in Lieu of Meeting) (DE 166-18). Yu's signature appears on an operations management agreement dated December 30, 1986, whereby defendant JMM and JMAC agreed to "use the same sets of manpower, facilities, and systems belonging to [defendant JMM]." (Operations Mgmt. Agreement, 1) (DE 166-7). Defendant JMAC agreed "to be charged by [defendant JMM] the necessary costs and expenses," of its use. (Id.). When the operations management agreement was renewed the following year, it was signed by Yu and Homer Hsieh ("Hsieh"), treasurer at defendant JMM and JMAC in 1986. (1987 Operations Mgmt. Agreement) (DE 166-21) (Nightingale Dep. 55:6-14) (Lists of Officers & Directors of JMM &

8

JMAC).  Hsieh had also worked in the purchasing department at Formosa.  (Nightingale Dep. 55:14-16).

In 1983, the board of directors of JMAC created a California executive committee and empowered it to

> undertake and assume all powers authorized by law to manage and effectuate policy of the full Board of Directors to achieve the following goals: (A) The taking of all actions necessary and proper to fulfill all Corporate obligations and rights under the purchase and sales agreement under which the assets of this corporation were originally purchased; and, (B) the taking of all actions required to meet the obligations to employees of this corporation to provide for their general welfare; and, (C) The taking of all actions to the full limit of the law which will establish a smooth, profitable and efficient corporate operations during this period of the early years of the company's history.

(Special Action of the Bd. of Directors) (DE 166-22).  Chi and Yu were named to the committee.

In February 1983, defendants JMM and Formosa, together with JMAC, entered into a co-borrower agreement with Bank of America that governed the terms of loans made from a $10 million joint line of credit.  (Co-Borrower Agreement) (DE 166-25).  The companies agreed that "their obligation for repayment [of the loan] is joint and several."  (Id.).  Wang signed on behalf of defendant JMM and JMAC.  (Id.).  The following year, a letter from Bank of America to defendant JMM and JMAC announced the availability of a $10 million line of credit to both companies, referencing as "support" a "[c]ontinuing guaranty executed by Chairman Y.C. Wang, Chairman of Formosa Plastic Corp., the parent company, plus promissory note and coborrower agreement cosigned by Formosa Plastic Corp. and J-M Manufacturing/J-M A/C Pipe Corp." (Sept. 1984 Bank of Am. Letter) (DE 166-26).  Another letter to Wang in October 1985 offered to extend the lines of credit to JMAC, and Wang accepted.  (Oct. 1985 Bank of Am. Letter) (DE 166-27).  In November 1985, the line of credit to defendant JMM and JMAC was increased to $15 million, again with reference to a guaranty from defendant Formosa and Wang, along with

9

reference to a cross-guarantee of defendant JMM and JMAC. (Nov. 1985 Bank of Am. Letter) (DE 166-28).

Nightingale testified that defendant Formosa "did not get involved too much [with JMM's] daily activities." (Nightingale Dep. 22:7-9). Formosa did, however, receive monthly performance reports for defendant JMM and filed consolidated tax statements with defendant JMM. (Nightingale Dep. 22:10-21).

Defendant Formosa has acknowledged that, at the time JMAC was manufacturing asbestos cement pipe and defendant JMM was selling the pipe, "it was widely acknowledged that asbestos was a very dangerous material." (Nightingale Dep., 18:25-19:12). It has also admitted that it has "always known" that PVC pipe "is much safer than asbestos-containing pipe." (Id., 21:9-16). Defendant JMM's internal correspondence from April 12 and 19, 1983, indicates that Wang and the executive vice president of Formosa Plastics Group of Taiwan visited the Stockton and Denison plants in April 1983. (JMM Internal Correspondence, April 12, 1983 and April 19, 1983) (DE 166-29). Internal correspondence further indicates that Wang again visited in 1988. (JMM Internal Correspondence, January 28, 1988) (DE 166-30).

In June of 1986, Yu, JMAC director and secretary, who, as noted above, was a Formosa sales department employee at some point prior to 1988, sent an internal memo requesting an analysis as to "how we can start to move all excess AC pipe inventory right away." (JMM Internal Correspondence, June 13, 1986) (DE 166-37). At the time of the instruction, the United States Environmental Protection Agency ("EPA") was contemplating a ban on asbestos. (Reichert Dep., 144:9-12).

10

B.      Larry Lee's Alleged Exposures

Plaintiff Larry Lee began working around asbestos cement pipe while working for a construction company in Fort Pierce, Florida from 1973 to 1976. (Larry Lee Dep. Vol. I, 51:1-10) (DE 164-4). In 1981, he took a job in Pompano Beach, Florida, as a salesman with Underground Supply Company ("Underground Supply"), a company which distributed pipes, among other materials. (Id., 61:11-15; 70:13-25). The pipes included asbestos cement pipe from Johns-Manville. (Id., 71:1-7).

In the course of his job, plaintiff Larry Lee was sometimes present when asbestos cement pipe was being installed, sawed and cut. (Id., 72:10-22). He estimated to being present "probably hundreds of times" in such cases, often within four to five feet. (Id., 73:20-23; 74:13-16). Conditions were "[d]usty and dirty and wind-blown." (Id., 74:6-9). He alleged that dust would fall on his clothes and face, and that he breathed the dust. (Id., 74:19-75:7).

In 1985, plaintiff Larry Lee moved to Raleigh, North Carolina, for purposes of employment with Davis Water and Waste Supply ("Davis"). (Id., 76:23-77:3). He continued selling asbestos cement pipe, with the predominant brand being pipe from defendant JMM. (Id., 77:12-22). He was present while workers sawed the asbestos pipe sold by defendant JMM, and testified that cutting of this pipe created "the same conditions" as those created in his earlier exposures with Underground Supply. (Id., 79:4-80:5). Plaintiff Larry Lee estimated to being around workers cutting defendant JMM's pipe "50, 75 times maybe." (Id., 80:14-15). Lee was also exposed to dust from asbestos cement pipes at Davis's distribution facility, when the pipes "would fall and bust and we would have to clean it up." (Id., 86:1-14). This included pipe sold by defendant JMM. (Id., 86:24-87:6). In the first part of his deposition, plaintiff Larry Lee testified that Davis ceased using asbestos cement pipe "somewhere around '88 or 1990," but in

11

concluding part, plaintiff testified that he would set the final date of use in 1987. (Id., 84:20-85:6); (Larry Lee Dep., Vol. II, 273:13-19) (DE 158-4).

Plaintiff Larry Lee was diagnosed with mesothelioma in September 2013, while resident in Hillsborough, North Carolina, where he has lived for the past 22 years. (Larry Lee Dep., Vol. I, 9:9-18, 11:8-14, 109:18-24); (Report of Edwin C. Holstein, M.D., M.S., 6) (DE 164-6). Plaintiff's medical expert, John Maddox, M.D. ("Maddox") has attributed plaintiff Larry Lee's mesothelioma to asbestos, including exposures from asbestos cement pipe. (Maddox Report, 5, 28) (DE 164-7, 164-8).

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard is met when "a reasonable jury can reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). On the other hand, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and summary judgment should be denied. Id. at 489-90.

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but rather contemplates whether a genuine issue exists for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986). In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Nevertheless, such inferences "must

still be within the range of reasonable probability" and the court should issue summary judgment "when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958)). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247–48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id. at 248–49.

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

B.      Analysis

    1.      JMM

Defendant JMM seeks partial summary judgment to the extent plaintiffs' claims relate to exposures from Johns-Manville pipes. Defendant argues that it is entitled to summary judgment "on any attempt by Plaintiffs to impute liability to [defendant JMM] for Johns-Manville A/C pipe." (Memo. In Supp., 9) (DE 158). Defendant JMM asserts that "[p]laintiffs cannot impute on to J-MM any pre 1983 [sic] exposure that Plaintiff may have experienced attributable to Johns-Manville A/C pipe." (Id.). Defendant JMM contends that it did not assume any of Johns-Manville's liabilities, and therefore cannot be held liable.

In response, plaintiffs state that they "do not contend that JMM bears liability for Johns-Manville A/C pipe, except to the extent that JMM sold this product after it took over Johns-

13

Manville's A/C pipe operations in 1983." (Pls'. Resp., 12) (DE 164). Plaintiffs point to the deposition and declaration of Armstrong who, as noted above, was an employee at the Denison plant from 1960 until 1987. Armstrong testified that defendant JMM continued to sell Johns-Manville asbestos cement pipe, and continued to use the "Johns-Manville" stencils to label some pipe it produced after 1983.

A party may be held liable for negligence based on a defective product in its "inspection or sale of the product." Ruffin v. Shaw Indus., Inc., 149 F.3d 294, 301 (4th Cir. 1998) (citing Driver v. Burlington Aviation, Inc., 110 N.C.App. 519, 527 (1993); Jolley v. General Motors Corporation, 55 N.C.App. 383, 385 (1982)). Such party may also be liable for breach of warranty in the sale of a product, see id. at 301, as well as failure to provide adequate warning or instruction in connection with the manufacture or sale of a product, see N.C. Gen. Stat. § 99B-5. It is thus clear that a party may be held liable for sales of a product, even if it was not the product's original manufacturer.

Defendant JMM asserts the absence of a genuine issue solely as to the fact of liability for sales of Johns-Manville pipe, based on imputed liability for Johns-Manville's actions. It did not challenge plaintiffs' evidence with respect to defendant JMM's own actions. Plaintiffs have come forward with evidence regarding defendant JMM's continued sale of pipes produced by Johns-Manville and continued practice of using the labels "Johns-Manville" and "J-M," thereby providing specific evidence demonstrating that it is not seeking to impute liability, but rather to assign liability for defendant JMM's own actions. This is sufficient to meet the burden set by defendant JMM's motion and to demonstrate a genuine issue of fact as to whether this defendant

14

has post-1983 liability for sales of pipe produced by or bearing the label of Johns-Manville.[9]  See Matsushita, 475 U.S. at 586–87.  To the extent defendant JMM seeks summary judgment on claims against it on the basis of a lack of liability for plaintiff's exposures to Johns-Manville pipe after 1983, this motion is denied.

On the other hand, plaintiffs have not provided specific evidence demonstrating a genuine issue of material fact as to claims against defendant JMM for plaintiff Larry Lee's pre-1983 exposures, and have clarified that they do not seek to assign liability for such exposures. Accordingly, in this part defendant JMM's motion is allowed.

Defendant JMM also moved originally for summary judgment on plaintiffs' punitive damages claims, arguing that Florida law should apply to plaintiffs' claims and that such damages are not recoverable under Florida's Asbestos and Silica Compensation Fairness Act. Fla. Stat. § 774.207(1).  As noted, in its reply defendant JMM states that it "is no longer seeking the application of Florida law for [plaintiffs' punitive damages] claim" on the basis of plaintiffs' clarification that they do not contend JMM has any liability for Johns-Manville pipe except to the extent it sold this asbestos containing product after it took over Johns-Manville's pipe operations.   (Reply, 2) (DE 173).   Defendant JMM further provides that it "withdraws its individual argument for punitive damages based on the Florida Asbestos and Silica Compensation Fairness Act."  Id.  Because defendant JMM's motion for summary judgment on plaintiffs' punitive damages claim is solely based on the argument that Florida law applies, where defendant JMM's reply includes withdrawal of that part of its motion for summary judgment, in this part JMM's motion is denied as moot.

---

[9]  Defendant JMM appears to concede this point in its reply, stating that the issue on which it moved for summary judgment "is not in dispute."  (Reply, 1-2) (DE 173).

Although defendant JMM maintains that "Florida law may still apply to some of Plaintiffs' other claims in this action," it concedes that, "[b]ecause J-MM did not move for summary judgment on those claims . . . the Court need not rule on that issue at this time." (Id., 2 n. 2). Where plaintiffs assert that North Carolina law applies, and where defendant JMM does not assert that the court must resolve choice of law issues at this time, the court does not reach the question of which state's law applies to plaintiffs' claims against defendant JMM.

2.    Formosa[10]

Plaintiffs respond to defendant's motion by asserting what they do not try to do in this case, that is pierce the corporate veil of Formosa or hold it vicariously liable based on defendant JMM's asserted negligent acts; "[r]ather, Plaintiffs are pursuing two theories of liability based on Formosa's own conduct and on its relationship and involvement with JMAC." (Resp. 2) (DE 166). Plaintiffs seek to show that defendant Formosa aided and abetted or engaged in a "concert of action" with defendant JMM and JMAC in negligently manufacturing and selling asbestos cement pipe, and engaged in a joint enterprise with JMAC to profit from the sales of asbestos cement pipe. Plaintiffs however allege in their complaint that defendant Formosa was the alter ego of defendant JMM and JMAC, and engaged in a conspiracy with defendant JMM and JMAC. (Comp. ¶¶ 10, 77-78) (DE 1). The court addresses below plaintiffs' theories of liability in this order: 1) "alter ego"; 2) joint enterprise and related joint venture; 3) aiding and abetting or concert of action; and 4) conspiracy.

---

[10]  Defendant Formosa urged in support of its motion that the law of Florida should be applied. However, as with defendant JMM, in its reply defendant Formosa puts that argument to the side with statement that "Formosa is no longer seeking the application of Florida law..." (Reply, 1 n. 1) (DE 174). Thus, both parties agree that North Carolina law applies to the claims against defendant Formosa. "Where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 169 n. 7 (4th Cir. 2013) (quoting Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) (brackets omitted)). Accordingly, the following analysis applies North Carolina law.

a.       "Alter Ego" Theory

When a "corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State, the corporate entity will be disregarded and the corporation and the shareholder treated as one and the same person, it being immaterial whether the sole or dominant shareholder is an individual or another corporation." Henderson v. Sec. Mortg. & Fin. Co., 273 N.C. 253, 260 (1968). Thus, "alter ego" theory, also referred to in North Carolina as the "mere instrumentality" theory, is used as a means of "piercing the corporate veil" in order to assign liability for a corporation's acts or obligations to a shareholder or parent corporation. See id.; see also Glenn v. Wagner, 313 N.C. 450, 455-56 (1985) (describing circumstances in which it is proper to "pierce the corporate veil," noting Henderson's discussion of "alter ego" theory, and holding that "[i]t is sufficient [to pierce the veil] where . . . one affiliated corporation is dominated by another to the extent that the dominated corporation has no separate mind, will or *identity* of its own.").

"Piercing the corporate veil is a drastic remedy and should be invoked only in an extreme case where necessary to serve the ends of justice." Best Cartage, Inc. v. Stonewall Packaging, LLC, 219 N.C. App. 429, 439 (2012) (quoting Dorton v. Dorton, 77 N.C. App. 667, 672 (1985)) (quotation marks omitted); see also In re Cnty. Green Ltd. P'ship, 604 F.2d 289, 292 (4th Cir. 1979) ("[T]he decision to pierce a corporate veil and expose those behind the corporation to liability is one that is to be taken reluctantly and cautiously."). "The facts that corporations have common officers, occupy common offices, and to a certain extent transact business for each other do not make the one corporation liable for the action of the other, except upon established

legal principles." B-W Acceptance Corp. v. Spencer, 268 N.C. 1, 8 (1966) (quoting 19 Am. Jur. 2d, Corporations, § 717).

Although plaintiffs alleged in their complaint that defendant Formosa was the "alter ego" of defendant JMM and JMAC, plaintiffs' response in opposition to this defendant's motion for summary judgment includes assertion that "[p]laintiffs do not seek to pierce the corporate veil." (Pls'. Resp., 2). Accordingly, plaintiffs have abandoned this theory, failing to carry their burden to show a genuine issue of material fact as to its application. In this part, to the extent plaintiffs' claims rest on this theory, defendant Formosa's motion for summary judgment is allowed.

    b.    Joint Enterprise

Plaintiffs assert in their response that defendant Formosa is liable on "joint enterprise" theory. "A joint enterprise is an alliance between two or more people in pursuit of a common purpose such that negligence of one participant may be imputed to another." Slaughter v. Slaughter, 93 N.C. App. 717, 720 (1989) (citing McAdams v. Blue, 3 N.C. App. 169, 173 (1968)). The term has often been used interchangeably with the terms "joint adventure" and "joint venture," though the rules and elements applicable to these terms are distinct. See, e.g., Harper v. Seaboard A.L.R. Co., 211 N.C. 398, 402 (1937) (using terms interchangeably); see also McAdams v. Blue, 3 N.C. App. 169, 172-73 (1968); 46 Am. Jur. 2d Joint Ventures § 4.

The basic difference between a joint venture and a joint enterprise is that the former generally involves a business relationship, while the latter does not. See 46 Am. Jur. 2d Joint Ventures § 4; see also McAdams, 3 N.C. App. at 172 (explaining that the term "joint enterprise" is "normally employed, not with reference to a business relationship comparable to a partnership, but by way of representing merely a unity of persons in the pursuit of a common purpose."). It would thus appear that the present facts implicate a joint venture rather than a joint enterprise.

18

The court nevertheless provides analysis for both theories, starting below with the joint enterprise theory that plaintiffs expressly advance.

In North Carolina, joint enterprise liability primarily developed in the context of motor vehicle accidents, where the plaintiff attempted to assign liability to a party other than the driver of a car, such as a co-owner or occupant. See Rushing v. Polk, 258 N.C. 256, 262-63 (1962); James v. Atl. & E. Carolina R. Co., 233 N.C. 591, 597 (1951); Albritton v. Hill, 190 N.C. 429, 431-32 (1925). It has, however, been applied to other circumstances. See Keith v. Wilder, 241 N.C. 672, 676 (1955) (approving jury instruction on joint enterprise in case involving fraudulent representation in sale of timber). Under a joint enterprise theory, the negligence of one party may be imputed to another when "there is a community of interest in the objects or purposes of the undertaking," and "an equal right to direct and govern the movement of each other with respect thereto." James, 233 N.C. at 598.

The complaint in this case includes no allegations that defendant Formosa was engaged in a joint enterprise with defendant JMM or JMAC. Although it is alleged that defendant Formosa was a "successor-in-interest," plaintiffs did not allege a community of interest with respect to asbestos containing products, nor that both companies had equal rights to direct the other's movements.

The Federal Rules of Civil Procedure require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir.2009). A properly pleaded complaint provides to an opponent "illumination as to the substantive theory under

which [plaintiff] [i]s proceeding, which is the function of the pleadings under the Federal Rules." Atl. Purchasers, Inc. v. Aircraft Sales, Inc., 705 F.2d 712, 717 (4th Cir.1983) (citation, ellipsis and quotation marks omitted) (quoting Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 66 (1978)).

Accordingly, a case may not proceed to trial on "an unpleaded theory of recovery" without "express or implied consent of the parties." Pinkley, Inc. v. City of Frederick, Md., 191 F.3d 394, 401 (4th Cir.1999); McLeod v. Stevens, 617 F.2d 1038, 1040 (4th Cir.1980). Further, "a court will not imply consent to try a claim merely because evidence relevant to a properly pleaded issue incidentally tends to establish an unpleaded claim." Quillen v. Int'l Playtex, Inc., 789 F.2d 1041, 1044 (4th Cir.1986). Rather, a party must amend the complaint, or the parties must "constructively amend the complaint" by, for example, "agreeing . . . to litigate fully an issue not raised in the original pleadings," or by addressing a theory of liability "in their summary judgment briefs." Interstate Petroleum Corp. v. Morgan, 249 F.3d 215, 227 (4th Cir.2001) (quotations omitted); see also Whitaker v. T.J. Snow Co., 151 F.3d 661, 663 (7th Cir.1998) (explaining that "[b]ecause both parties squarely addressed the strict liability theory in their summary judgment briefs, the complaint was constructively amended to include that claim"). Constructive amendment through summary judgment briefing generally occurs when the moving party addresses a theory of liability – a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion. See Cloaninger v. McDevitt, 555 F.3d 324, 336 (4th Cir. 2009); see also Harris v. Reston Hosp. Ctr., 523 F. App'x 938, 947 (4th Cir. 2013).

Defendant Formosa has not implicitly consented to amendment of plaintiffs' complaint to incorporate "joint enterprise" theory, but, rather, has challenged this theory as improperly

20

pleaded.  For the reasons explained above, the court agrees that plaintiffs failed properly to plead defendant Formosa's liability based on "joint enterprise" theory.  Thus, they cannot assert the theory as a means to avoid summary judgment.

Even if the court was to allow plaintiffs to raise this theory now, their evidence fails to support the theory.  Plaintiffs' evidence does not show that the companies had an "equal right to direct and govern the movement of each other" for purposes of showing joint enterprise liability. Plaintiffs point to the fact that Yu, an employee of defendant Formosa at some point before 1988, also signed an operating agreement with defendant JMM on behalf of JMAC.  They also note that Chi, who had been president of Formosa at some point, had the power to sign checks for JMAC.  In addition, plaintiffs point to Chi and Yu's placements on JMAC's California executive committee, and the statement in the J-M Policy and Procedure Manual that JMAC and defendant JMM were "part of" defendant Formosa.

These facts are insufficient to satisfy the "equal right to direct" element of "joint enterprise" liability.  The fact that some of defendant Formosa's officers were also officers of JMAC and had power to conduct certain business transactions does not give defendant Formosa itself the right to direct defendant JMM or JMAC's activities.  See B-W Acceptance, 268 N.C. at 8 (distinguishing between corporations that "have common officers, occupy common offices, and to a certain extent transact business for each other" from a corporation which "exercises actual control over another.").  It is not even clear that Chi and Yu were employees of defendant Formosa at the same time that they filled their respective roles with JMAC.  The statement that plaintiffs rely upon from the J-M Policy and Procedure Manual establishes little more than an ordinary parent-subsidiary relationships among defendant Formosa, defendant JMM, and JMAC.

21

Furthermore, the cited evidence supports only a one-way relationship, in which defendant Formosa was the directing party. This does not show a "joint enterprise."

For all these reasons, the court grants summary judgment on plaintiffs' theory of "joint enterprise" liability.

        c.     Joint Venture

A joint venture is

> an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.

Pike v. Wachovia Bank & Trust Co., 274 N.C. 1, 8 (1968) (quoting In re Simpson, 222 F. Supp. 904, 909 (M.D.N.C. 1963)). The term is synonymous with "joint adventure." Id. Like a joint enterprise, a joint venture may be used to impute liability from one member of the undertaking to another. See id., at 10-11; see also Rhoney v. Fele, 134 N.C. App. 614, 620 (1999). Essential elements include 1) "an agreement, express or implied, to carry out a single business venture *with joint sharing of the profits*," and (2) "*an equal right of control* of the means employed to carry out the venture." Synovus Bank v. Coleman, 887 F. Supp. 2d 659, 670 (W.D.N.C. 2012) (quoting Southeastern Shelter Corp. v. BTU, Inc., 154 N.C. App. 321, 326 (2002)); Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 403 (M.D.N.C. 2003) (same); see also Cheape v. Town of Chapel Hill, 320 N.C. 549, 562 (1987) (requiring "each joint venturer [to] stand in the relation of principal, as well as agent, as to each of the other coventurers.") (quoting 46 Am. Jur. 2d Joint Ventures § 1).

Summary judgment must be granted on this theory for reasons similar to those that foreclosed plaintiffs' joint enterprise theory. First, plaintiffs do not adequately plead this theory.

Second, as explained above, plaintiffs fail to raise a genuine issue that the three companies each had an "equal right of control" over the venture. Third, there is no genuine issue that defendant Formosa shared in the profits of the actual sale and manufacture of asbestos cement pipes; rather, its interest was in the values of its assets as a parent company and shareholder of defendant JMM and JMAC. Courts have found such interest insufficient to establish a joint venture. See Wood v. McDonald's Corp., 166 N.C. App. 48, 61 (2004) (holding that 50% shareholder of company did not share in profits).[11] Thus, summary judgment must also be granted, to the extent plaintiffs assert "joint venture" liability.

d.     Aiding and Abetting or Concert of Action

Plaintiffs' assertion of an aiding and abetting or concert of action theory of liability rests on a case from the North Carolina Court of Appeals, Stetser v. TAP Pharm. Prods. Inc., 165 N.C. App. 1, 20 (2004). See (Resp., 21). There the court quoted from the Restatement (Second) of Torts, § 876 (1979) (hereinafter "Section 876"), which describes a theory of liability for "Persons Acting in Concert," as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

---

[11] See also Servicios Especiales Al Comercio Exterior v. Johnson Controls, Inc., 791 F. Supp. 2d 626, 636-37 (E.D. Wis. 2011) (finding parent's stock ownership "simply too generic" to establish joint enterprise); Zwicki v. Superior Mach. Co. of S.C., 2002 WL 34365098, at *8 (D. Minn. 2002) ("Under Minnesota law, plaintiffs may not use theories of joint venture or joint enterprise to attribute a corporation's liability to its shareholders or its parent corporation."); In re Silicone Gel Breast Implants Prods. Liab. Litig., 887 F. Supp. 1455, 1462 (N.D. Ala. 1995) ("As a general proposition, the fact that an entity is a corporation precludes a finding that it is a partnership or a joint venture or a finding that its stockholders constitute partners or joint venturers."); St. Joseph Hosp. v. Wolff, 94 S.W. 3d 513, 527-28 (Tex. 2003) (distinguishing "common business purpose" and "common pecuniary interest" from "community of pecuniary interest" for purposes of establishing "joint enterprise" liability).

> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Stetser, 165 N.C. App. at 19-20 (quoting Section 876).

The court in Stetser went on to conclude that the North Carolina Supreme Court had "adopted this section of the Restatement as it applied to the negligence of joint tortfeasors." Id. at 20 (citing Boykin v. Bennett, 253 N.C. 725 (1961)). Stetser considered an appeal from a trial court order certifying plaintiffs' class action suit for inflating prescription drug prices, which was brought against the corporate owners of the drug manufacturers, the corporate owner of a company that marketed a treatment system, and others. Id. at 4-5. At issue in the case was whether the law of North Carolina materially differed from the law of other states, in order to determine whether application of North Carolina law violated the rights of defendants and out-of-state plaintiffs. Id. at 12, 14. Thus, review of the lower court's decision did not actually consider whether the allegations or evidence established any claims, but, rather, the decision to certify the class. See id. at 14-27.

Where the basis of plaintiffs' aiding and abetting or concert of action theory ultimately rests on Section 876, the court will first consider whether and to what extent this represents the law of North Carolina.

i.    Section 876 in North Carolina Law

In applying the law of the state of North Carolina, the court must treat decisions of the North Carolina Supreme Court as binding, and "depart[ ] from an intermediate court's fully reasoned holding as to state law only if convinced that the state's highest court would not follow that holding." See Iodice v. United States, 289 F.3d 270, 274-75 (4th Cir. 2002) (quoting

24

<u>Assicurazioni Generali, S.p.A. v. Neil</u>, 160 F.3d 997, 1003 (4th Cir. 1998)) (quotation marks omitted).

Notwithstanding the court's holding in <u>Stetser</u>, the place of Section 876 in North Carolina law is somewhat unclear. "Except as specifically adopted in [North Carolina], the Restatement should not be viewed as determinative of North Carolina law." <u>Hedrick v. Rains</u>, 344 N.C. 729, 729 (1996). The North Carolina Supreme Court case which <u>Stetser</u> cited as adopting Section 876 involved the death of an automobile passenger resulting from a crash during an automobile race on a public highway. <u>Boykin</u>, 253 N.C. at 726. In <u>Boykin</u>, the North Carolina Supreme Court considered whether those who raced motor vehicles on a public highway engaged in "independent" acts, or whether their acts were "joint and concurrent" for the purpose of establishing liability. <u>Id.</u> at 728. To answer this question, the court reviewed and summarized treatises and case law from a number of other jurisdictions, including a case from Connecticut. <u>Id.</u> at 728-731, 731 (citing <u>Carney v. De Wees</u>, 136 Conn. 256, 70 A.2d 142 (1949)). In summarizing <u>Carney</u>, the court quoted from a section of the Connecticut opinion that, in turn, quoted section 876(b) and related comment. <u>Boykin</u>, 253 N.C. at 731. Specifically, the court held that

> For harm resulting to a third person from the tortious conduct of another, a person is liable if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tort-feasor and is responsible for the consequences of the other's act.

<u>Id.</u> (quoting <u>Carney</u>, 136 Conn. at 262, 70 A.2d at 145-46) (ellipsis and quotation marks omitted).

The court in <u>Boykin</u> went on to note that the racing of motor vehicles on a street or highway violated North Carolina law, N.C. Gen. Stat. § 20-141.3(a) and (b), and thus was negligence *per se*. <u>Id.</u> at 731. It held that "[t]he primary negligence involved is the race itself. All who willfully participate in speed competition between motor vehicles on a public highway are jointly and concurrently negligent and, if damage to one not involved in the race proximately results from it, all participants are liable." <u>Id.</u> at 731-32.

In <u>Blow v. Shaughnessy</u>, 88 N.C. App. 484 (1988), the court stated that <u>Boykin</u> had "approved [Section 876's] position involving the negligence of joint tort feasors," and relied on that case, along with federal securities law cases, to hold that North Carolina would recognize an action for aiding and abetting a breach of fiduciary duties. <u>Id.</u> at 489-92. <u>Blow</u> involved allegations that an investment advisor was defrauding plaintiffs, and that defendants continued to execute trades and provide market information to the investment advisor with knowledge that he was committing fraud. <u>Id.</u> at 492.

To the extent <u>Blow</u> relied on federal law, however, the United States Supreme Court subsequently undermined that court's rationale in <u>Central Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164, 177-78 (1994), holding that federal securities laws did not prohibit aiding and abetting. Consequently, <u>Blow</u> no longer is valid precedent. <u>Bottom v. Bailey</u>, ___ N.C. ___, 767 S.E. 2d 883, 889 (2014). Whether a claim for aiding and abetting a breach of fiduciary duty is valid under North Carolina law remains an open question. <u>Id.</u>, ___ N.C. ___, 767 S.E. 2d at 889 (declining to address whether such claim exists, because complaint failed to include proper allegations in support); <u>see</u> <u>In re Bostic Constr., Inc.</u>, 435 B.R. 46, 66 (Bankr. M.D.N.C. 2010) ("It is not even clear that North Carolina recognizes a cause of action for aiding and abetting breach of fiduciary duty."). Nevertheless, that part of the decision noting

26

the adoption of Section 876 has not been specifically overruled, and the case provides some support for finding Section 876 to be the adopted law of North Carolina, at least in certain circumstances.

In another case, <u>McMillan v. Mahoney</u>, 99 N.C. App. 448, 451 (1990), the North Carolina Court of Appeals considered whether a complaint had sufficiently alleged a claim for relief in pleading that defendants had engaged in a "concerted action." The complaint alleged that the two defendants were firing air rifles near the plaintiffs' home, that either one or the other had fired in a negligent, careless and reckless manner, and that plaintiff suffered injury as a result. <u>Id.</u> at 450. The court quoted subsections (b) and (c) of Section 876, and noted an illustration from the Restatement involving two individuals negligently shooting across a public road, where liability was assigned to shooter A even though shooter B's bullet was actually the one that struck plaintiff. <u>Id.</u> at 451-52. The court also referred to the law of several other jurisdictions finding liability in similar circumstances of simultaneously firing a weapon. <u>Id.</u> at 452. The court ultimately held that, "[a]lthough the complaint does not contain the words 'acting in concert,' we believe that under the recognized tort theories discussed above the complaint alleges facts sufficient to give defendants notice of the theory under which plaintiffs are proceeding." <u>Id.</u> at 453.

More recent decisions from North Carolina's intermediate court indicate a desire to limit the scope of Section 876. In <u>Hinson v. Jarvis</u>, 190 N.C. App. 607 (2008), a case which followed <u>Stetser</u>, the court considered an accident caused when the driver of a vehicle allegedly suffered a seizure. <u>Id.</u> at 608-09. Plaintiffs sued the wife of the driver, alleging that she breached her duty by traveling with the driver despite knowing that he had suffered from such seizures. <u>Id.</u> at 610. The court noted that the North Carolina Court of Appeals had "cited [section 876] three times

but has never explicitly adopted it." Id. at 611. It also characterized Boykin's treatment of Section 876 with more reservation than prior decisions, as follows: "[o]ur Supreme Court has cited Connecticut law, which quoted an older but substantially similar version of section 876, but has also not expressly adopted Restatement (Second) of Torts § 876." Id. at 611-12. The court then distinguished the facts under consideration from those at issue other cases applying Section 876. It distinguished Boykin because the evidence failed to show "substantial encouragement to breach a duty of care," but rather indicated that defendant was "only complicit in her husband's breach of ordinary care." Id. at 612. Blow was distinguished because the case "did not involve any fiduciary relationship between [the driver] and plaintiffs." Id. at 612, n. 2. The court also distinguished McMillan because "there are no factual issues as to whether [the driver] or defendant caused the accident," explaining that defendant did not "aid[ ] her husband's negligence by interfering with his ability to drive so that the exact cause of the accident could not be known." Id. at 613. The court expressly declined "to extend liability under section 876 of the Restatement of Torts to a third person whose conduct did not fall below an ordinary standard of care or involve an issue as to which person was the cause of the harm alleged." Id.

More recently, in Wilcox v. City of Asheville, 222 N.C. App. 285 (2012), the court relied on McMillan and its quotation of Section 876 to find that summary judgment should not be granted when the evidence showed that the defendants were both shooting recklessly at a vehicle in which plaintiff was a passenger. Id. at 297.

Finally, an unpublished case, North Carolina II, LP v. Branch Banking & Trust Co., No. COA12-898, 2012 WL 6597764 (N.C. Ct. App. Dec. 12, 2012), arose from a dispute between a real estate developing company, a construction company, and the bank that was the construction company's largest lender and creditor. Id. at *1. The construction company filed lien claims

28

alleging that the real estate company owed it over $2 million in damages, but subsequently went bankrupt. Id. The construction company's claim was then assigned to the bank. Id. Plaintiffs sued the bank, claiming the construction company had slandered its title, and that the bank aided and abetted the slander by continuing to pursue the construction company's action, despite the fact that, based on reports provided by the construction company, the bank knew or should have known that the amounts claimed in the liens were excessive. Id. The North Carolina Court of Appeals quoted Hinson for the proposition that it had "only adopted Section 876 in limited circumstances . . . as it is applied to the negligence of joint tortfeasors." Id. at *2. The court found the case more analogous to Hinson than other cases applying Section 876. Id. In doing so, it found that the defendant bank's action "occurred after [the construction company's] alleged tort," and that the actions alleged were "more closely aligned with complicit action than with incitement." Id. Finding no case law applying Section 876 under the circumstances presented, the court affirmed the trial court's order dismissing the complaint. Id.

These authorities support that Section 876 has indeed been recognized as North Carolina law by the state's intermediate court, but that court is reluctant to extend it to factual scenarios outside of those specifically provided in the Restatement or in established case law. Finding no clear reason to conclude that the state's highest court would not hold the same, this court follows suit.

ii.     Application of Section 876

Federal courts are to tread carefully when asked to extend state tort law to new scenarios. See Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 348 (4th Cir. 1998) ("As a federal court exercising concurrent jurisdiction over this important question of state law we are most unwilling to extend North Carolina tort law farther than any North Carolina court has been

willing to go."). The facts of the instant case are quite different from any of those addressed in North Carolina case law or the Restatement itself. This court is not aware of any court which has found Section 876 satisfied in circumstances such as those presented here. Especially in light of the reluctance that the North Carolina Court of Appeals has expressed in applying Section 876 to new situations, these considerations counsel the undersigned to proceed with caution in consideration of whether any of Section 876's alternative clauses are met by the instant facts.

Plaintiffs do not specify the precise clause of Section 876 under which they advance their claims. The court will therefore analyze each in turn. As noted, clause (a) applies when a party "does a tortious act in concert with the other or pursuant to a common design with him." Restatement (Second) of Torts § 876(a). Comment on clause (a) provides that "[p]arties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result." Id., cmt. a. "The agreement need not be expressed in words and may be implied and understood to exist from the conduct itself." Id. Further, "it is essential that the conduct of the actor be in itself tortious. One who innocently, rightfully and carefully does an act that has the effect of furthering the tortious conduct or cooperating in the tortious design of another is not for that reason subject to liability." Id., cmt. c.

Plaintiffs fail to establish a genuine issue as to applicability of clause (a). Plaintiffs' argument in support of their concert of action or aiding and abetting claim relies on the following evidence: 1) Wang's position as the initial stockholder at the time that JMAC purchased asbestos cement pipe operations from Johns-Manville; 2) Yu's instruction in June of 1986 that JMM salesmen should sell off the asbestos pipe inventory as soon as possible; 3) other

30

Formosa employees worked for JMAC and defendant JMM; 4) the admission of Nightingale, defendant Formosa's corporate representative, that, at the time JMM was selling asbestos pipe and defendant JMAC was manufacturing asbestos pipe, "it was widely acknowledged that asbestos was a very dangerous material" (Nightingale Dep., 18:25-19:12); 5) Nightingale's acknowledgment that, at the time of these operations, defendant Formosa knew that PVC pipe was "much safer than asbestos-containing pipe" (Id., 21:9-16); 6) defendant Formosa's execution of the co-borrower agreement with Bank of America and subsequent guarantees for JMAC's line of credit, ranging from $10-15 million; and 7) the visits of defendant Formosa's officers to the Denison and Stockton plants in April 1983 and early 1988.

With respect to Wang's status as an initial JMAC shareholder, Yu's internal correspondence, and the general matter that Formosa employees worked for defendant JMM and JMAC, this evidence does not support an aiding and abetting claim against defendant Formosa. A principal is typically responsible to third parties for injuries resulting from his agent's acts only when those acts are "committed during the existence of the agency and within the scope of the agent's actual or apparent authority from the principal." See Johnson v. Schultz, 364 N.C. 90, 94 (2010). This principle is applicable in the corporate context, where "[t]he general rule is well established that a corporation is liable for the torts and wrongful acts or omissions of its agents or employees acting within the scope of their authority or the course of their employment." Raper v. McCrory-McLellan Corp., 259 N.C. 199, 205 (1963). Similarly, it is a "well settled" principle that, in order to impute the knowledge of a director to a corporation, the director "must have acquired the knowledge officially as a member of the board and in the course of business as director or for the purpose of being communicated by him to the board." Anthony v. Jeffress, 172 N.C. 378, 381 (N.C. 1916). Likewise,

31

> a corporation is not bound by the action or chargeable with the knowledge of its officers, with respect to a transaction, in which such officer is acting in his own behalf or in the behalf of another corporation of which he is also an officer. Only that knowledge which its officer acquires while acting in its behalf, and which it is his duty to communicate to it, is imputed by the law to a corporation.

Cheek v. Squires, 200 N.C. 661, 670-71 (N.C. 1931); see also Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 250 (4th Cir. 1967) ("The general rule is that the knowledge of an officer of the corporation obtained while acting outside the scope of his official duties . . . is not, merely because of his office, to be imputed to the corporation."). Plaintiffs fail to raise a genuine issue as to whether Wang, Yu, or other persons were acting in the scope of their actual or apparent authority or the course of their employments for defendant Formosa when they performed the actions alleged. Their acts and knowledge from these transactions are not binding or imputed to defendant Formosa.

This leaves evidence that defendant Formosa acted as the guarantor on credit extended to defendant JMM and JMAC, that defendant Formosa's representatives visited the Stockton and Denison plants, that defendant Formosa had a general knowledge of the hazards of asbestos and that it knew asbestos cement pipes were more dangerous than PVC pipes. The precise nature of the allegedly "tortious act" which was performed "in concert" or "pursuant to a common design" is unclear from this evidence, and plaintiffs fail to offer necessary clarification. Moreover, this court has not located any case in or outside North Carolina finding that such conduct is "in itself tortious," as Section 876 requires and as the state's own cases indicate to be necessary. See Restatement (Second) § 876, cmt. c; see also Boykin, at 731-32 (holding that drivers' acts of racing in vehicles were negligent per se); Wilcox, 222 N.C. App. at 297 (holding evidence sufficient to survive summary judgment when it showed both defendants were shooting recklessly at a vehicle in which plaintiff was passenger); McMillan, 99 N.C. App. at 451-52

(complaint adequately states cause of action where each defendant commits negligent act of shooting); Hinson, 190 N.C. App. at 613 (requiring third person's conduct to "fall below an ordinary standard of care.").

The court is also cognizant of cases which have declined to pierce the corporate veil based on a parent company's status as a loan guarantor, among other facts. Kramer Motors, Inc. v. British Leyland, Ltd., 628 F.2d 1175, 1177 (9th Cir. 1980); Calvert v. Huckins, 875 F. Supp. 674, 679 (E.D. Cal. 1995); United States v. Bliss, 108 F.R.D. 127, 131-32 (E.D. Mo. 1985); Akzona Inc. v. E.I. Du Pont De Nemours & Co., 607 F. Supp. 227, 237-38 (D. Del. 1984); see also Vitol, S.A. v. Primerose Shipping Co. Ltd., 708 F.3d 527, 546 (4th Cir. 2013) ("The mere extension of a line of credit from one corporate entity to another, however, does not create a reasonable belief of alter ego."). Particularly on the facts of this case, the court is loathe to permit plaintiffs to use Section 876 as a means around established law, implicitly flouting the stringent test for piercing the corporate veil. To the extent plaintiffs proceed under clause (a), summary judgment is granted.

Clause (b) applies to situations where the party "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." Commentary provides that the rule applies "whether or not the other knows his act is tortious." Restatement (Second of Torts) § 876, cmt. d. Courts have recognized that Section 876(b) thus consists of two elements: "(1) knowledge that the primary party's conduct is a breach of duty and (2) substantial assistance or encouragement to the primary party in carrying out the tortious act." Aetna Cas. & Sur. Co. v. Leahey Const. Co., 219 F.3d 519, 533 (6th Cir. 2000) (quoting Andonian v. A.C. & S., Inc., 97 Ohio App. 3d 572, 647 N.E. 2d 190, 191-92 (1994)).

The evidence is insufficient to establish either the requisite knowledge or the substantial assistance prong. First, a general awareness that a material may be dangerous or that products made from different materials may be safer is insufficient to demonstrate affirmative knowledge that a party is breaching a duty by selling or manufacturing products made from that material. For example, the presence of a safer alternative is but one of the points to be considered under North Carolina law regarding "inadequate design or formulation" claims. See N.C. Gen. Stat. § 99B-6. The failure to adopt such an alternative design must be "unreasonable," or else the product at issue must be designed so unreasonably "that a reasonable person, aware of the relevant facts, would not use or consume a product of this design." Id. § 99B-6(a). Further, the manufacturer must have "acted unreasonably in designing or formulating the product," taking into account such factors as the "nature and magnitude of the risks of harm," "likely awareness of product users . . . of those risks of harm," "[t]he extent to which the design or formulation conformed to any applicable government standard," the "utility of the product," and "[t]he technical, economic, and practical feasibility of using an alternative design or formulation at the time of manufacture." Id. at § 99B-6(a) and (b). Plaintiffs fail to point to evidence which raises a genuine issue of material fact linking a general awareness of the dangers of asbestos or asbestos pipes with an affirmative knowledge that defendant JMM and JMAC were acting unreasonably and breaching a duty in their design, manufacture and sale of asbestos cement pipe.

Plaintiffs have also failed to point to evidence which raises a genuine issue of material fact that defendant Formosa provided substantial assistance. The only evidence of support specifically attributable to defendant Formosa is that it assisted defendant JMM and JMAC with obtaining a line of credit. While that line of credit does indeed appear substantial, there are

34

insufficient facts regarding how that credit was used (if it was used at all), in addition to a lack of evidence of defendant Formosa's knowledge as to how the credit would be used, to create a genuine issue of material fact on this element of liability.

Finally, clause (c) of Section 876 assigns concert of action liability when a party "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." This clause applies to situations where "one personally participates in causing a particular result in accordance with an agreement with another." Restatement (Second) of Torts § 876, cmt. e. In contrast to clause (b), clause (c) applies "irrespective of [the defendant's] knowledge that his act or the act of the other is tortious." Id. Commentary further provides the example that "each of a number of trespassers who are jointly excavating a short ditch is liable for the entire harm done by the ditch, although each reasonably believes that he is not trespassing." Id.

For the reasons explained above, plaintiffs' evidence is insufficient to create a genuine issue of material fact with respect to whether defendant Formosa provided substantial assistance to defendant JMM or JMAC. Furthermore, the evidence is insufficient to show that defendant Formosa's conduct, separately considered, constituted a breach of duty to a third person. The court thus grants summary judgment with respect to plaintiffs' claims against defendant Formosa, also to the extent they rest on clause (c) of Section 876.

Accordingly, plaintiffs having failed to demonstrate a genuine issue of material fact with respect to each of Section 876's clauses, the court grants summary judgment on plaintiffs' claims against defendant Formosa, to the extent they rely on aiding and abetting or concert of action theories.

35

e.      Conspiracy

"A conspiracy is an agreement between two or more persons to commit an unlawful act or to do a lawful act in an unlawful manner." <u>Evans v. Star GMC Sales & Serv., Inc.</u>, 268 N.C. 544, 546 (1966); <u>Burton v. Dixon</u>, 259 N.C. 473, 476 (1963).  North Carolina does not recognize an action for civil conspiracy in itself.  <u>Shope v. Boyer</u>, 268 N.C. 401, 405 (1966).  However, conspiracy may be used to "associate the defendants together" for the purposes of imputing the conduct of one defendant to another.  <u>See id.</u>  "If a conspiracy is formed and an overt act, causing damage, is committed by any one or more of the conspirators in furtherance of the conspiracy, all of the conspirators are liable." <u>Burton</u>, 259 N.C. at 476.

Defendant Formosa has moved for summary judgment on plaintiffs' claims to the extent they rest on a theory of conspiracy, arguing that plaintiffs' evidence fails to establish the requisite relationship between defendant Formosa, defendant JMM and/or JMAC.   Plaintiffs do not address how the evidence comports with North Carolina law on conspiracy, outside of relying on Section 876.  Accordingly, the court grants summary judgment on the conspiracy claim as well.

Summary judgment having been granted on each of plaintiffs' alleged theories of liability against defendant Formosa, the court dismisses the case against it.

## CONCLUSION

In accordance with the foregoing, the court GRANTS in part, and DENIES in part the motions now before it.  For the reasons given:

1.      Summary judgment is GRANTED for defendant JMM regarding plaintiffs' claims to the extent they arise from pre-1983 exposures to Johns-Manville asbestos cement pipe.  It is DENIED to the extent defendant JMM seeks summary

36

judgment on claims for exposures to Johns-Manville pipe after 1983. It is also DENIED as MOOT to the extent defendant JMM seeks summary judgment on punitive damages claims against it.

2.     Summary judgment is GRANTED for defendant Formosa. This defendant is hereby DISMISSED from the case.

There remain now two dispositive motions for the court to take up and consider, that is defendant Genuine Parts's partial summary judgment motion and the asserted motion by Pneumo. Upon their disposition, by which time the parties' expert discovery shall be completed pursuant to the court's amended case management order, (DE 163), defendants Certainteed Corporation, Genuine Parts, JMM, Kawasaki, Metropolitan Life, Pneumo if remaining, and Yamaha shall have 60 days to file any motions raising issues pursuant to Federal Rules of Evidence 702, 703, or 705, <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993), <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999) or similar case law. Going forward, the caption of the case shall reflect the dismissal of defendant Formosa.

SO ORDERED, this the 16th day of July, 2015.

_____
LOUISE W. FLANAGAN
United States District Judge

37