IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:13-CV-826-FL

| | | |
|---|---|---|
| LARRY WINSLOWE LEE and SUSAN PROVOST LEE, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | |
| CERTAINTEED CORPORATION; GENUINE PARTS COMPANY, d/b/a National Automotive Parts Association (a/k/a NAPA); J-M MANUFACTURING COMPANY, INC., sued individually and as parent and alter ego to J-M A/C Pipe Corporation; METROPOLITAN LIFE INSURANCE COMPANY; PNEUMO ABEX LLC, sued individually and as successor-in-interest to Abex Corporation and as successor-in-interest to American Brakeblok; and YAMAHA MOTOR CORPORATION, U.S.A.; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | ORDER |
| Defendants. | ) | |

This case comes before the court on motion for partial summary judgment filed by

defendant Genuine Parts Company ("Genuine Parts") as to plaintiffs' willful and wanton conduct

claim (Third Cause). (DE 144). The issues raised are ripe for consideration. For the reasons

explained, the court grants the motion.

## STATEMENT OF THE CASE

Plaintiffs, residents of Wake County, North Carolina, complain of personal injury and loss of consortium, where plaintiff Larry Winslowe Lee ("Larry Lee") was diagnosed with mesothelioma on or about September 13, 2013. Plaintiffs allege that his condition resulted from exposure to asbestos during his employment as mechanics' helper, maintenance laborer, inspector, construction worker, and salesman, in addition to automotive maintenance work performed on his own personal vehicles and those of his family. Plaintiffs originally brought a total of eight claims against 23 defendants, of which five claims were asserted against all defendants with the exception of defendant Metropolitan Life Insurance Company ("MetLife").

With respect to claims against all defendants excluding Metlife, defendants are alleged to have: 1) acted negligently in putting asbestos or asbestos-containing products into interstate commerce (First Cause); 2) breached implied warranties that asbestos materials were of good and merchantable quality and fit for their intended use (Second Cause); 3) acted willfully and wantonly in exposing plaintiff Larry Lee to asbestos (Third Cause); 4) committed false representation and fraud regarding the dangers of asbestos exposure to plaintiff Larry Lee (Fourth Cause);[1] and failed to warn plaintiff Larry Lee of the dangers associated with asbestos exposure (Fifth Cause). In a separate claim, defendant MetLife is alleged to have engaged in a conspiracy where, it is asserted, Metlife aided and abetted the negligence and marketing of asbestos-containing products (Sixth Cause). Defendants Formosa and J-M Manufacturing are also the subject of a separate claim premised on conspiracy for the manufacture and sale of

---

[1] Plaintiffs' claim for false representation and fraud was dismissed against defendants Kawasaki Motors Corp., U.S.A. ("Kawasaki"), J-M Manufacturing Company, Inc. ("JMM"), Formosa Plastics Corporation U.S.A. ("Formosa"), and Genuine Parts. April 11, 2014 Order (DE 105); January 26, 2015 Order (DE 131); March 10, 2015 Order (DE 141).

asbestos-containing products (Seventh Cause).  Plaintiff Susan Provost Lee ("Susan Lee") seeks also to recover for her loss of consortium (Eighth Cause).

Reference is made to the court's order entered July 16, 2015, for a more detailed statement of the case.   As set forth, Formosa succeeded on its motion for summary judgment as to all claims asserted against it.  July 16, 2015 Order (DE 210).  Defendant JMM prevailed in part on summary judgment, where the court granted its motion to the extent plaintiffs' claims arise from pre-1983 exposures to Johns-Manville asbestos cement pipe.  Id.

Procedural developments of note since entry of that order July 16, 2015, include dismissal of defendant Kawasaki from the case.   July 22, 2014 Order (DE 213).   Where defendant Pneumo Abex LLC's motion for summary judgment suffered a host of procedural infirmities, it was denied.  July 20, 2015 Order (DE 211).  Accordingly, at this juncture six of the original 23 defendants remain, and the caption has been revised to so reflect.[2]

The motion at hand was filed on March 10, 2015, the same day on which the court entered its order dismissing upon joint motion plaintiffs' claim that defendant Genuine Parts committed false representation and fraud regarding the dangers of asbestos exposure to plaintiff Larry Lee (Fourth Cause).   (DE 141).  Defendant Genuine Parts relies on various documentary evidence together with plaintiff Larry Lee's deposition testimony.  Plaintiffs rely in opposition on plaintiff's deposition testimony, expert report and affidavit, written discovery responses, deposition testimony of defendant's representative, and various studies, publications, and meeting minutes concerning exposure to asbestos during brake repair or installation work.

---

[2]  With respect to other case developments, though not now before the court on motion, there is an undercurrent as to whether or not application of Florida law may be appropriate.  Defendant Genuine Parts filed a "Suggestion of Florida Law" May 27, 2015, asserting Florida law should apply to plaintiffs' claim that this defendant breached implied warranties that asbestos materials were of good and merchantable quality and fit for their intended use (Second Cause).  (DE 195).   Defendant CertainTeed Corporation ("CertainTeed") espouses the same.  (DE 190).   Plaintiffs directly responded to defendant CertainTeed's suggestion.  (DE 194).

3

**STATEMENT OF THE UNDISPUTED FACTS**

A.      Larry Lee's Alleged Exposures

        Plaintiff Larry Lee performed automotive brake work over a number of years in several different capacities. From 1963 to late 1964 or early 1965, he worked at Standard Oil Station ("Standard Oil") in Vero Beach, Florida, where he performed 25 to 30 brake jobs. Larry Lee Dep. Vol. I, 23:1-10, 24:18-21 (DE 165-1). He then worked at a Pure Oil Company ("Pure Oil") station in Vero Beach for approximately one year, performing around 25 brake jobs. Id., 34:16-35:17. In 1966 or 1967, plaintiff Larry Lee switched his location of employment to a Texaco station in Wabasso, Florida, where he worked in a full or part-time capacity until 1971, performing 50 to 75 brake jobs over this timeframe. Id., 41:23-42:16, 43:3-10, 44:6-10. From 1963 to 1990, he estimated performing "a couple [brake jobs] a year" for himself, family, friends, and relatives. Id., 89:6-18. He continued performing brake maintenance until recently. Id., 89:10-12.

        To perform a brake job, the vehicle would be raised on a jack, and the wheel would be removed, along with the hub, also referred to as a brake drum. Id., 25:14-20, 26:6-8. This would expose the brakes and brake shoes. Id., 25:17-20. Plaintiff Larry Lee testified that the brakes used for replacements were often oversized and that "we would have to file the brakes a little bit" to put them on the vehicle. Id., 26:18-27:14, 36:16-37:8, 44:23-45:20, 91:6-15. This occurred on approximately half of the jobs that plaintiff Larry Lee performed in the course of his employment, although he did not testify as to how often it occurred during the personal brake jobs he performed. Id. The filing process, also referred to as sanding, created dust which plaintiff Larry Lee inhaled. Id., 28:2-17, 37:9-18, 46:12-47:2, 91:21-92:5. In addition to breathing dust from sanding, plaintiff Larry Lee testified to inhaling dust released from the brake

4

shoes and lining when he opened brake boxes at Standard Oil. Id. 28:18-29:24. He also testified to performing clean-up duties while employed at Standard Oil and Pure Oil, including cleaning of the areas where brake jobs were performed. Id. 33:16-34:12, 41:1-22.

In each of his employment and personal capacities, plaintiff Larry Lee primarily performed brake work with brakes manufactured by Rayloc. Id., 24:23-25:1, 29:25-30:4, 36:4-7, 37:22-38:5, 44:11-15, 90:1-6. Rayloc is a division of defendant Genuine Parts. Dep. of Paul LeCour ("LeCour"), 10:21-22 (165-5).[3] From the 1930s until the early 1980s, all Rayloc branded brake shoes contained asbestos. Id., 23:21-24:6. In the early 1980s, defendant Genuine Parts began to manufacture some brake shoes without asbestos. Id.. It ceased the production of asbestos-containing brake shoes in 2001. Id., 25:3-5.

Plaintiff Larry Lee moved from Florida to North Carolina in 1985. Larry Lee Dep., Vol. I, 9:9-18, 76:23-77:3. He was diagnosed with mesothelioma in September 2013. Id., 109:18-24. Plaintiffs' expert Edwin Holstein, M.D., states that the cleaning of wheel wells with compressed air causes brake drum dust to blow into the air, and that such dust "may be inhaled by anyone within that space, even at a distance." Holstein Report, 11 (DE 165-2). He further states that, "[w]hen new brake linings are ground, drilled or riveted, the same is true" and that "in both cases, exposure will persist for many hours." Id. In addition, he states that the "[d]uring transport and handling of boxes containing new brake linings, considerable dust is released, and is routinely found in the brake lining boxes." Id. Plaintiffs' medical expert, John Maddox, M.D., has opined that plaintiff Larry Lee's mesothelioma was caused by exposure to asbestos,

---

[3] Deposition of LeCour, testifying on behalf of Genuine Parts as an operations senior technical adviser, was given in a case initiated in the Ohio Court of Common Pleas in 2009, Harris, et al. v. Goodyear Tire & Rubber Co., et al., No. CV-09-686099.

including exposure to dust from asbestos-containing friction products such as brakes and brake linings. Aff. of John Coulter Maddox, 2, 6, 26-29 (DE 165-3).

B.      Evidence Regarding Knowledge of Asbestos Risks

        Plaintiffs have submitted a number of documents regarding the historical knowledge of the dangers of asbestos, the dangers from brakes, and defendant Genuine Parts' own knowledge. An article published by two scientists employed by Ford Motor Company ("Ford") in 1970 reported on the results of a study of the concentration of asbestos fibers produced during car brake service. D.E. Hickish & K.L. Knight, "Exposure to Asbestos During Brake Maintenance," 13 Ann. Occup. Hyg. 17, 17-18 (1970) (DE 165-8) ("Hickish & Knight Article").[4]  The article reported the results of a study of the concentration of asbestos fibers to which mechanics are exposed in performing brake work. Id.  A series of tests were performed at the service bay of a Ford dealer in the London area. Id.  In the first reported test, samples of asbestos fiber concentrations were collected over two time periods, each spanning 45 minutes, from the side of a car and in a dust cloud created when brake shoes and drums were cleaned. Id., 17.  The Hickish & Knight Article also reported on collections of "personal samples" from mechanics over the course of a workshift. Id., 17-18.  These personal samples ranged as high as 1.12 fibers/cm$^3$, with a time-weighted average of 0.68 fibers/cm$^3$. Id., 18.  General atmospheric samples collected during truck brake service reported concentrations as high as 0.49 fibers/cm$^3$, and personal samples reported concentrations up to 7.09 fibers/cm$^3$. Id., 18-19.

        Hickish and Knight then compared these exposure levels with the "Hygiene Standards for Chrysotile Asbestos Dust" published by the British Occupational Hygiene Society ("OHS") in

---

[4] Pages from this document were submitted out of order on the court's docket. Citations are to the page numbers as they appeared in the publication, and not to the numbers assigned by the court's case management/electronic case filing system.

1968, which suggested that cumulative levels of asbestos exposure should not exceed 100 fiber-years/cm³.[5]  Id., 18-19; see also Occupational Exposure to Asbestos, Notice of Proposed Rulemaking, 40 Fed. Reg. 47652, 47654 (Oct. 9, 1975) (describing the British OHS report on hygiene standards).   As to the servicing of cars, the Hickish & Knight Article states that, "[w]hile the [hygiene] standard may be exceeded in the dust cloud during actual brake clean[ing,] the personal exposure of the operator studied was well below the standard." Id.,19. As to the servicing of trucks, the article states that

> [t]he standard is not exceeded during brake cleaning in the general atmosphere [aw]ay from the immediate vicinity of the operation, but personal exposures in the [vic]inity do exceed the standard.  On a daily basis, the personal exposure levels are [be]low the standard, although that of the brake cleaner approaches it. It should be noted, however, that in a fleet workshop, brake cleaning operations [illegible] not necessarily take place daily.

Id.

> The Hickish & Knight Article concluded that

> exposure to asbestos during brake maintenance is not as severe as was anticipated, and in the situations we examined, the personal exposure of the operators was below the limit corresponding to a 50-year exposure.  It is however recommended that care should be exercised during brake cleaning to avoid inhalation of the dust produced, and the development of cleaning procedures which would reduce air contamination is desirable . . . .  Our environmental studies have not included maintenance procedures which involve the filing or grinding of brake lining material, and we would envisage that these would give rise to considerably increased air contamination by chrysotile asbestos, with the attendant need for strict precautions to prevent the inhalation of fibers.

Id., 20-21.

---

[5] Studies often express the concentration of asbestos as the number of fibers per cubic centimeter (cm³), which is also equivalent of fibers per milliliter (mL).  See Asbestos Exposure Limit, 73 Fed. Reg. 11284, 11286 (Feb. 29, 2008). "Fiber-years" are calculated by multiplying a worker's duration of exposure (measured in years) by the average air concentration during the period of exposure (measured in number of fibers per cubic centimer/milliliter of air).  See U.S. Dep't of Health & Human Servs. Agency for Toxic Substances & Disease Registry, Tremolite Asbestos and Other Related Types of Asbestos, available at http://www.atsdr.cdc.gov/asbestos/more_about_asbestos/health_consultation/ (last visited July 17, 2015).  For example, 100 fiber-years/cm³ is the equivalent of 50 years at two fibers/cm³, or 25 years at four fibers/cm³.  Asbestos Exposure Limit, 73 Fed. Reg. at 11286.

7

In 1972, the Occupational Health and Safety Administration ("OSHA") enacted regulations limiting occupational exposure to asbestos. Standard for Exposure to Asbestos Dust, 37 Fed. Reg. 11318 (June 7, 1972). The regulations set an immediately-effective limit of asbestos exposure at an eight-hour time-weighted average concentration of five fibers/cm$^3$, to be reduced to two fibers/cm$^3$ by July 1, 1976. Id., 11320. The regulations also included a labeling requirement for asbestos products, as follows:

> Caution labels shall be affixed to all raw materials, mixtures, scrap, waste, debris, and other products containing asbestos fibers, or to their containers, except that no label is required where asbestos fibers have been modified by a bonding agent, coating, binder, or other material so that during any reasonable foreseeable use, handling, storage, disposal, processing, or transportation no airborne concentrations of asbestos fibers in excess of the exposure limits prescribed . . . will be released. . . . The label shall state:

CAUTION

Contains Asbestos Fibers
Avoid Creating Dust
Breathing Asbestos Dust May Cause Serious Bodily Harm

Id., 11321.

Minutes from a February 16, 1973 meeting of the Friction Materials Standards Institute ("FMSI") Asbestos Study Committee report on a discussion on "[t]he subject of labeling of finished friction materials." Minutes of the FMSI, 3 (DE 165-10). The minutes report disagreement among members as to whether labeling was necessary to comply with requirements set by OSHA, where two members asserted that the exception for asbestos that is "modified by a bonding agent, coating, binder, or other material" exempted friction products. Id. However, the FMSI minutes report that the majority of committee members believed that the five fibers/cm$^3$ standard set by OSHA would be "exceeded in many areas such as inspection, drilling, and grinding," and that "it is apparent that where subsequent working of the material

8

can raise the airborne asbestos concentrations above the limits that the manufacturer is required to label the material." Id. The minutes further state that "with undusted linings from a manufacturer it is likely that customer inspection, or possibly opening of cartons, could show airborne fiber concentrations in excess of the 5 fibers/[cm$^3$]." Id. Members ultimately resolved

> That (1) where asbestos containing materials do not have the asbestos fiber completely locked in, or (2) where subsequent operations may be performed on asbestos containing materials, the hazardous labeling practice be adhered to in accordance with the Label Specifications in the OSHA Standards for Exposure to Asbestos Dust.

Id., 5.

A study published in 1976 reports that "[d]ata obtained on asbestos exposure of garage mechanics during brake lining maintenance and repair work show[s] that fiber concentrations frequently in excess of regulated limits are common." Arthur N. Rohl, et al., "Asbestos Exposure during Brake Lining Maintenance and Repair," 12 Envtl. Res. 110, 110 (1976) (DE 165-9).

In 1986, the Asbestos Action Program of the Environmental Protection Agency ("EPA") published a pamphlet for auto mechanics warning about the dangers of asbestos. "Guidance for Preventing Asbestos Disease Among Auto Mechanics," (June 1986) (DE 165-6) ("1986 Pamphlet"). The 1986 Pamphlet states that "[f]riction materials, such as brake linings and clutch facings, often contain asbestos. Millions of asbestos fibers can be released during brake and clutch servicing. Grinding and beveling friction products can cause even higher exposures." Id., 1. The 1986 Pamphlet states that "there is no known level of exposure to asbestos below which health effects do not occur." Id.

For further evidence on the state of the art regarding the dangers of asbestos, as well as testimony on specific causation, plaintiffs' present the expert report of Edwin C. Holstein, M.D.

9

("Holstein"). (DE 165-2). Holstein served as a member of the faculty at the Mount Sinai School of Medicine in New York City from 1976 to 1984, and has retained a voluntary faculty position as Assistant Clinical Professor in the Environmental Sciences Laboratory to present. Id., 4. He has studied the history of knowledge concerning the health effects of asbestos, including the history of regulations and epidemiology on the subject. Id. Holstein describes certain studies not entered into the record here, including a 1930 study by E.R.A. Merewether and C.W. Price which found that inhaling dust containing asbestos fibers could lead to disabling or fatal lung disease. Id., 14 (citing E.R.A. Merewether & C.W. Price, "Report on the Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry," His Majesty's Stationery Office 28-29 (1930)). The Merewether and Price study "was the first epidemiologic survey of asbestos-exposed workers in textile mills in Great Britain." Id. These scientists "prescribed a series of dust suppression measures that are still valid today," including "warning, education and training of all those who would be exposed." Id., 15. Merewether and Price "specifically mentioned thermal insulation, 'jointings,' (gaskets) and packing," but "also expressed their opinion that asbestos was a potential hazard to health in any industry in which dry asbestos products were abraded or otherwise manipulated so as to produce dust." Id.

Holstein states that, "[b]y the 1950s, it was firmly established that the inhalation of asbestos fibers increased the risk of lung cancer." Id., 14. Holstein notes an editorial comment that asbestos was a cause of lung cancer, published in the Journal of the American Medical Association in 1949, which he describes as "the most widely read medical journal in America at the time." Id., 17. By 1955, over 60 cases of lung cancer associated with asbestos exposure had been published. Id., 18. A 1960 article documented 33 cases of mesothelioma in people exposed to asbestos in and around crocidolite asbestos mines in South Africa, which was

10

followed in the 1960s by "numerous studies . . . reporting mesothelioma in association with asbestos exposure in several different countries and in a variety of exposure circumstances." Id. Holstein reports that 700 scientific publications considered the health effects of asbestos by the end of 1964, including an article showing that mesothelioma could occur "among household members of [asbestos] workers (exposed to dust that came home on the clothes of the worker) and among those who lived within one-half mile of an asbestos factory." Id. After 1965, "an accelerating stream of scientific and medical articles on the health effects of asbestos appeared . . . . The information was available in the libraries of all medical schools, almost any hospital, and many doctors' officers." Id. Holstein asserts that, "[t]o learn about the dangers of asbestos would have required only an hour or two of research in the medical literature, and much of the information had also been published in lay publications." Id. Holstein summarizes the scientific knowledge as follows:

> [I]t was known at least as early as 1930 with the Merewether and Price study that asbestos dust was released into the air when any dry asbestos-containing product is abraded or manipulated or turned in the dry state. This would reasonably include both brake linings and joint compounds, since they are "abraded" in the usual course of working with them, and the dust that results is visible to the naked eye without the need for scientific instruments for detection or airborne asbestos. Packing and 'jointings' (gaskets) were specifically identified by Merewether and Price as such a hazard. It was also known that with the release of asbestos dust into the air, disabling and fatal diseases would result among substantial percentages of people so exposed. It was recognized that dust control measures were necessary, among which was the need to train, educate and warn exposed workers. With the passage of time, it became clear that asbestos exposures cause not only asbestosis, but lung cancer and mesothelioma, and that very brief and/or low exposures to asbestos were sufficient to cause mesothelioma. It was also known that mesothelioma was invariably fatal, as it still is today. It was demonstrated that chrysotile asbestos was among the varieties of asbestos that would cause mesothelioma. An hour or two of research in the medical literature was sufficient to know all of the facts just stated.

Id., 18-19.

Holstein also describes the state of knowledge specifically with respect to asbestos brakes, reporting on several more publications not presently part of the record:

> Further considering the hazards of work with asbestos-containing brake linings prior to 1971, in addition to the Merewether and Price admonitions in 1930, George and Leonard demonstrated abnormal chest x-rays in individuals who manufactured brake linings in 1939. Stone reported cases of asbestosis with disability among brake lining manufacturers in 1940. In the same year, Hatch reported a case of asbestosis in a brake lining weaver. In the journal *Foundation Facts,* published by the Industrial Health Foundation, which was supported by many major corporations, asbestosis in grinders and drillers of bake bands (linings) was reported in 1940. The same journal reported the work of George and Leonard mentioned above, in 1941. In 1948, widespread recognition of this problem was demonstrated in 1948 [sic], when asbestosis in brake liners was made a compensable disease. And in 1948, an official of the Ford Motor Company named Castorp published his view in the National Safety News that asbestos in brake linings was a potential hazard.

Id.

In deposition taken in another case, the corporate representative for Genuine Parts stated that the Rayloc division "first became aware that inhaled asbestos could create a hazardous condition in a human being" at some point "in the [19]70s." LeCour Dep. 38:15-19. He testified that defendant Genuine Parts "took all the necessary safety precautions to protect [its] employees." Id., 38:22-23. He stated that he did not know specifically when defendant Genuine Parts or Rayloc first became aware that grinding or chipping brake lining could be hazardous, but that it used equipment in its plants to "prevent that material that's coming off of the brake lining from floating in the air." Id., 39:17-40:5. The company never tested how much asbestos could be released during the removal of a brake shoe. Id., 41:16-20.

LeCour testified that defendant Genuine Parts held clinics in which it "sold our product based on do not grind, do not modify the friction surfaces in any way, shape, or form, our product will fit the vehicle and drum properly." Id. He asserted that "on every clinic, and even

12

in our service manual, we said do not grind the product.  And we say install it as it comes in the box."  Id., 40:14-19.

In interrogatory responses provided in this case, defendant Genuine Parts responds that

for many years [Genuine Parts] conducted numerous brake clinics for jobbers or other interested parties on vehicle braking systems, the advent of disc brakes, the mechanics of anti-lock brakes, etc., as such vehicle features became commonplace.  Depending on the time period and topic of such seminars, oral and written materials provided to participants cautioned against grinding [Genuine Parts] products, the creation of dust during the brake repair process, and against the inhalation of said dust beginning at least in the early 1960s.

Def's. Resp. To Interrogs, 20 (DE 165-4).  The first warning sign specifically mentioning asbestos dust appeared on Rayloc brake products in 1988, in response to a California regulation requiring labeling and warnings on all asbestos products. LeCour Dep., 41:3-6; Def's. Resp. to Interrogs., 19-20.

## DISCUSSION

A.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  This standard is met when "a reasonable jury can reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  On the other hand, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and summary judgment should be denied.  Id., 489-90.

Summary judgment is not a vehicle for the court to weigh the evidence and determine the truth of the matter, but rather contemplates whether a genuine issue exists for trial.  Anderson v.

13

Liberty Lobby, 477 U.S. 242, 249 (1986). In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Nevertheless, such inferences "must still be within the range of reasonable probability" and the court should issue summary judgment "when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quoting Ford Motor Co. v. McDavid, 259 F.2d 261, 266 (4th Cir. 1958)). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson, 477 U.S. at 247–48. Accordingly, the court must examine the materiality and the genuineness of the alleged fact issues in ruling on this motion. Id., 248–49.

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

B.     Analysis

Plaintiffs complain of a panoply of acts and omissions constituting defendant's willful and wanton conduct in their complaint, going back to 1929 when defendant Genuine Parts and others knew or should have known of data indicating the dangers of asbestos-containing products to plaintiff Larry Lee and others. Compl. ¶¶ 55, 56 (DE 1). Willful and wanton conduct may have multiple implications for a case. For instance, proof of such conduct may be used to permit recovery despite plaintiff's contributory negligence. Sorrells v. M.Y.B. Hosp. Ventures of Asheville, 332 N.C. 645, 648 (1992); Brewer v. Harris, 279 N.C. 288, 297 (1971). It

14

may also be used as an aggravating circumstance warranting a punitive damages award. N.C. Gen. Stat. § 1D-15(a).[6]

"An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others . . . . Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." Yancey v. Lea, 354 N.C. 48, 52-53 (2001) (quoting Hinson v. Dawson, 244 N.C. 23, 28 (1956); Foster v. Hyman, 197 N.C. 189, 191 (1929)).[7] "Willful negligence" has been defined as an act

> done purposely and deliberately in violation of law or when it is done knowingly and of set purpose, or when the mere will has free play, without yielding to reason. The true conception of wilful negligence involves a deliberate purpose not to discharge some duty necessary to the safety of the person or property of another, which duty the person owing it has assumed by contract, or which is imposed on the person by operation of law.

---

[6] The provision prescribing "Standards for recovery of punitive damages" reads in full:

> (a)     Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded:
>> (1)     Fraud.
>> (2)     Malice.
>> (3)     Willful or wanton conduct.
> (b)     The claimant must prove the existence of an aggravating factor by clear and convincing evidence.
> (c)     Punitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another. Punitive damages may be awarded against a person only if that person participated in the conduct constituting the aggravating factor giving rise to the punitive damages, or if, in the case of a corporation, the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages.
> (d)     Punitive damages shall not be awarded against a person solely for breach of contract.

N.C. Gen. Stat. § 1D-15. The term "Willful or wanton conduct" is defined to mean "the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. § 1D-5(7).

[7] Federal courts sitting in diversity apply federal procedural law and state substantive law. Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co., 736 F.3d 255, 261 n. 3 (4th Cir. 2013). Although defendant Genuine Parts has filed a notice asserting that Florida law should apply to plaintiffs' claim for breach of implied warranty (DE 195), both parties' briefs on the instant motion assume the application of North Carolina law. "Where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." Cosey v. Prudential Ins. Co. of Am., 735 F.3d 161, 169 n. 7 (4th Cir. 2013) (quoting Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997) (brackets omitted)).

Id. (quoting Foster, 197 N.C. at 191) (quotation marks omitted). "While ordinary negligence has as its basis that a person charged with negligent conduct should have known the probable consequences of his act . . . wanton and willful negligence rests on the assumption that he knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results." Akzona, Inc. v. S. Ry. Co., 314 N.C. 488, 496 (1985) (quoting Wagoner v. N.C. R.R., 238 N.C. 162, 168 (1953)). Thus, ordinary negligence differs from willful and wanton conduct "not in degree or magnitude of inadvertence or carelessness, but rather [in] intentional wrongdoing or deliberate misconduct affecting the safety of others." Yancey, 354 N.C. at 53. Willful and wanton conduct at least requires that "the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e. a *conscious* disregard of the safety of others." Id.[8]

This court recently had occasion to consider a claim for willful and wanton conduct on a set of facts similar to those presented here. In Yates v. Air & Liquid Sys., No. 5:12-CV-752 (E.D.N.C. Feb. 21, 2014), the plaintiff's exposures occurred while changing brakes and opening brake boxes in the course of his employment as a parts clerk and deliveryman at an automobile dealership, a gas station attendant, a parts clerk as an equipment depot, and also on personal brake jobs. Id., 7-8, 21-22. The latest date of the plaintiff's exposure was approximately 1962. Id. The court considered whether the evidence created a genuine issue as to plaintiffs' claims for willful and wanton conduct or false representation/fraud. Id., 18. Plaintiffs presented an

---

[8]  The language incorporated in the two preceding quotations was used in Yancey specifically to define "gross negligence," however Yancey also noted that the North Carolina Supreme Court "has often used the terms 'willful and wanton conduct' and 'gross negligence' interchangeably to describe conduct that falls somewhere between ordinary negligence and intentional conduct. Yancey, 354 N.C. at 157. Under North Carolina's punitive damages statute, it is clear that willful and wanton conduct is more culpable than gross negligence. See N.C. Gen. Stat. § 1D-5(7) (" '[W]illful and wanton conduct' means *more than* gross negligence.") (emphasis added). The precise relationship between these two terms is not entirely clear outside of the context of punitive damages, but the cases likewise establish that willful and wanton conduct involves conduct at least as egregious as gross negligence. See Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 284-85 (4th Cir. 1993); FDIC v. Willetts, 48 F. Supp. 3d 844, 851 n. 2 (E.D.N.C. 2014); Jones v. City of Durham, 360 N.C. 81, 86 (2005), withdrawn and superseded on reh'g, 361 N.C. 144 (2006); McCauley v. Thomas *ex rel.* Progressive Univ. Ins. Co., ___ N.C. App. ___, ___ S.E. 2d ___, 2015 WL 4081965, at *6 (July 7, 2015).

16

assortment of evidence, including evidence post-dating the last date of plaintiff's exposure, pre-exposure articles generally noting the dangers of workplace asbestos dust, and an expert's report referencing two studies of brake friction products that preceded the plaintiff's exposure. Id., 19-20, 26.

The court held this evidence did not raise a genuine issue as to willful and wanton conduct because plaintiffs failed to show that defendants had actually read the articles referenced, or knew of the studies, or knew of the dangers of asbestos in the defendants' products. Id., 19-20. On plaintiffs' motion for reconsideration, the court maintained that the evidence did not show a conscious and intentional disregard for safety, and also held that additional deposition evidence purporting to show that defendant knew that asbestos could potentially be harmful under indefinite conditions failed to meet the standard of willful and wanton conduct. Yates v. Air & Liquid Sys., No. 5:12-CV-752, 2014 WL 4923603, at *20, 25 (Sept. 30, 2014).

Here, plaintiffs have failed to introduce evidence permitting a reasonable inference that defendant Genuine Parts performed an act "purposely and with knowledge that such is a breach of duty to others," so as to show "conscious disregard of the safety of others." Yancey, 354 N.C. at 53.

Considering first the historical literature that plaintiffs offer regarding the dangers of asbestos, plaintiffs have not presented any evidence that defendant Genuine Parts was actually aware of any particular article or study. There is no evidence that defendant Genuine Parts was a member of the FMSI, or otherwise received any of the publications mentioned. The evidence likewise does not permit a reasonable inference that defendant Genuine Parts was purposely neglecting any duty to conduct research while knowing that, in doing so, it was breaching a duty.

17

Next considering Holstein's opinion, the court takes note that it is not bound to accept expert assertions lacking record support as evidence sufficient to raise a genuine issue on summary judgment, and may consider the facts underlying those opinions.  See Talley v. Danek Med., Inc., 179 F.3d 154, 162 (4th Cir. 1999) (finding district court was within its discretion to disregard "speculative testimony" from expert that "had no apparent support in the record" on summary judgment); Tyger Constr. Co. Inc.v. Pensacola Constr. Co., 29 F.3d 137, 143 (4th Cir. 1994) ("Expert opinion evidence based on assumptions not supported by the record should be excluded."); M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 165 (4th Cir. 1992) (rejecting expert's affidavit, submitted on summary judgment, that was "wholly conclusory and devoid of reasoning"); Prichard Enters., Inc. v. Adkins, 858 F. Supp. 2d 576, 589 (E.D.N.C. 2012) (rejecting conclusory expert testimony); see also Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations.").  As to Holstein's opinion that "an hour or two of research in the medical literature" was sufficient to discover facts regarding the potential release of asbestos from brake products, the diseases that could result from low exposure, the need for dust control measures, and the dangers of asbestos at low exposures and the potential for their release from brake products, Holstein Report at 19, the facts underlying these assertions fail to show willful and wanton conduct, for the following reasons.

Plaintiffs have not submitted the studies upon which Holstein relies to make this statement into the record.  Holstein's statement itself is ambiguous, as it covers  literature spanning several decades and fails to specify precisely when "[a]n hour or two of research" would have been sufficient to identify these facts.  Considering the discussion that precedes this

18

summary in the expert report, Holstein's assertion that all the facts could have been discovered after "only an hour or two of research in the medical literature" appears based on a general statement that "scientific and medical articles on the health effects of asbestos . . . [were] available in the libraries of all medical schools, almost any hospital, and many doctors' offices" at some point after 1965. <u>Id.</u>, 18. This does not show that these scientific and medical articles included reported facts that would have notified brake manufacturers such as plaintiff of the "probable consequences" of manufacturing their products or failing to warn users about their products. <u>See</u> <u>Akzona</u>, 314 N.C. at 496.

Furthermore, Holstein does not offer specific facts regarding the availability of publications such as the Merewether and Price study which showed the potential for asbestos dust release from any asbestos-containing product. Holstein states that the need for dust control measures were recognized to be necessary, but does not specify the types of industries or work where such measures were recognized. Holstein's statement that mesothelioma was known to result from "very brief and/or low exposures to asbestos" appears to be premised on studies of mesothelioma among household members of workers who were exposed to dust that came home on the workers' clothes, and cases of the disease among persons who lived nearby asbestos factories. <u>Id.</u>, 18. These studies are too attenuated from the repair of brake linings to provide evidence of a conscious disregard of known risks necessary to establish willful and wanton conduct. A general knowledge that asbestos may have been harmful under unspecified circumstances is not enough to show that defendant Genuine Parts "knew the probable consequences, but was recklessly, wantonly or intentionally indifferent to the results." <u>Akzona</u>, 314 N.C. at 496. Nor is the prospect of access to articles regarding the general hazards of asbestos, or to case reports regarding brake lining manufacturers, evidence that raises a genuine

19

issue as to whether defendant Genuine Parts breached any known duty to research, test, or warn of the harmful propensities of its product.

As for the 1970s OSHA regulations, plaintiffs do not identify evidence that defendant Genuine Parts recognized a duty imposed by these regulations and acted purposely and with knowledge that they were breaching such duty, or that injury was a probable consequence of such violation. Yancey, 354 N.C. at 53; Akzona, 314 N.C. at 496. The court notes that a violation of an OSHA regulation is not *per se* negligence and is not, by itself, enough evidence of willful and wanton conduct to present a jury issue. Schenk v. HNA Holdings, Inc., 170 N.C. App. 555, 561 (2005). The OSHA violations alleged here, either by themselves or in conjunction with the other facts plaintiffs cite, do not create a genuine issue of willful and wanton conduct.

Turning to the evidence regarding warnings that defendant Genuine Parts issued via clinics and service manuals, the record is lacking in specifics regarding the content of these warnings, the dates and persons to which warnings were presented, the personnel responsible for providing the warnings, and the reason such warnings were given. The evidence does not permit inference that Genuine Parts knew of a duty to issue additional warnings and consciously disregarded it.

LeCour acknowledged a general awareness that inhaling asbestos could created a hazardous condition, but as noted above, such general awareness is not enough to establish a conscious disregard of a known duty. Evidence of a general awareness of risks under undefined circumstances fails to raise a genuine issue as to whether defendant Genuine Parts acted in conscious disregard of a known duty to disseminate additional warnings regarding its products to individuals such as plaintiff Larry Lee.

20

In addition, plaintiffs have not shown evidence that defendant Genuine Parts actively sought to conceal or misrepresent the dangers of its products, such as would show knowledge of a breach of duty and such as is commonly identified in case law holding that the evidence creates a genuine issue of willful and wanton. See Fussman v. Novartis Pharm. Corp., No. 1:06-CV-149, 2010 WL 4273195, at *5 (M.D.N.C. Oct. 25, 2010) (finding jury issue where plaintiff forecast evidence purporting to show defendant concealed or misrepresented information regarding risk factors and clinical trial findings, controlled the flow of information about the link between its drugs and disease, and refused to acknowledge a link between its drugs and disease in spite of contrary evidence); see also Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1389 (4th Cir. 1995) (under Virginia law, finding jury issue of willful and wanton conduct where evidence showed defendant failed to give Food and Drug Administration case reports, instructed sales representatives to avoid discussing with physicians an article outlining the dangers of combining its drugs with alcohol, and sent a letter to pharmacists and hospitals asserting that no link between liver the use of its drugs and alcohol); Owens-Corning Fiberglas Corp. v. Watson, 243 Va. 128, 144-48 (1992) (finding evidence sufficient to show willful and wanton conduct where internal memorandums and corporate witness testimony permitted inference that asbestos manufacturer knew that inhaling dust from its product could cause lung disease, actively concealed the danger, and selectively warned employees while failing to warn others).

While the evidence offered may tend to show that defendant Genuine Parts was negligent, it is not sufficient to show that this defendant's conduct was willful and wanton. It does not allow the jury to reasonably find that defendant Genuine Parts affirmatively "knew the probable consequences" of its actions, or acted with "conscious disregard of the safety of

others." <u>Yancey</u>, 354 N.C. at 53; <u>Akzona</u>, 314 N.C. at 496.  Accordingly, summary judgment is granted on plaintiffs' claim for willful and wanton conduct (Third Cause).

## CONCLUSION

In accordance with the foregoing, the court GRANTS defendant Genuine Parts' motion for partial summary judgment, (DE 144), as to plaintiffs' claim for willful and wanton conduct (Third Cause).  The parties shall have 60 days to file any motions raising issues pursuant to Federal Rules of Evidence 702, 703, or 705, <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999) or similar case law.

SO ORDERED, this the 27th day of July, 2015.


_____
LOUISE W. FLANAGAN
United States District Judge