# EXHIBIT 3

Exhibit 3 - 1118BerrymanDraft

1

```
1       - - - - - - - - - - - - - - - - - - - - - - - - -
           REALTIME AND INTERACTIVE REALTIME TRANSCRIPT
2                     ROUGH DRAFT DISCLAIMER
        - - - - - - - - - - - - - - - - - - - - - - - - -
3

4                        IMPORTANT NOTICE:

5                      AGREEMENT OF PARTIES

6       We, the party working with realtime and rough draft
        transcripts, understand that if we choose to use the
7       realtime rough draft screen or the printout, that we
        are doing so with the understanding that the rough
8       draft is an uncertified copy.

9       We further agree not to share, give, copy, scan, fax
        or in any way distribute this rough draft in any form
10      (written or computerized) to any party.  However, our
        own experts, co-counsel, and staff may have LIMITED
11      INTERNAL USE of same with the understanding that we
        agree to destroy our rough draft and/or any
12      computerized form, if any, and replace it with the
        final transcript upon its completion.
13
        CASE:   Larry Lee v. Air & Liquid, et al.
14      WITNESS:  Michael Berryman
        DATE:  November 18, 2015
15
        REPORTER'S NOTE:
16      Since this deposition has been in rough draft form,
        please be aware that there may be a discrepancy
17      regarding page and line number when comparing the
        realtime screen, the rough draft, and/or rough draft
18      disk/CD with the final transcript.

19      Also, please be aware that the realtime screen and/or
        the uncertified rough draft transcript may contain
20      untranslated steno, reporter's notes in asterisks,
        misspelled proper names, incorrect or missing Q/A
21      symbols or punctuation, and/or nonsensical English
        word combinations.  All such entries will be corrected
22      on the final, certified transcript.

23      Court Reporter's Name:
```

Case 5:13-cv-00826-FL   Document 263-3   Filed 11/24/15   Page 2 of 56

Exhibit 3 - 1118BerrymanDraft

Rebecca Arrison

24

25

♀                                                                        2

1                   MICHAEL BERRYMAN,

2           being first duly sworn, testified as follows:

3                       MR. IOLA:  Ryan, do you want to go

4           ahead and put your stipulations on the record?

5                       MR. BROWNING:  Yeah, yeah.  Before

6           we get going, this is Ryan Browning for Defendant

7           J-M Manufacturing Company, Inc.  Before we get

8           started I wanted to put a few stipulations on the

9           record.  First, that an objection by one is an

10          objection for all; second, that all objections

11          are preserved until the time of trial, except

12          those as to form; and finally, that the parties

13          agree that Mr. Berryman is being sworn in

14          remotely today for the purpose of this telephonic

15          deposition.

16                      MR. IOLA:  And this is Sam Iola

17          for the Plaintiff Larry Lee, and all of that is

18          agreed to.

Page 2

Exhibit 3 - 1118BerrymanDraft

19                          EXAMINATION

20      BY MR. IOLA:

21              Q.   Good afternoon, Mr. Berryman, how are you?

22              A.   I'm great; how about yourself?

23              Q.   I'm good.

24                   Could you good ahead and please state your

25      name and just give a spelling of the last name for


♀                                                          3


1       the record, please.

2               A.   Yes.  It's Michael James Berryman, and

3       that's B as in boy, e-r-r-y-m-a-n.

4               Q.   Mr. Berryman, what is your address, please?

5               A.   My office address is 426 South -- I'm

6       sorry -- 426 North West 5th Street, Oklahoma City,

7       Oklahoma, 73102.

8               Q.   As you know, this testimony is being given

9       in the Larry Lee case.  Who are you retained by for

10      your testimony here today?

11              A.   J-M Manufacturing.

12              Q.   Do you charge a retainer?

13              A.   No, I usually don't.

14              Q.   How about in this case?

                             Page 3

Exhibit 3 - 1118BerrymanDraft

15          A.    No, I have not in this case.

16          Q.    Okay.  What materials have you brought with

17     you to this deposition?

18          A.    Well, I have everything that's listed on the

19     first page -- first or second page of my report.  I

20     have all those things here at my desk now.  They are

21     shown on my report page one and two under the heading

22     Document.

23          Q.    Okay.  And for those -- for the documents

24     that you're listing as essentially your reliance

25     materials, did you have any input on what materials

♀                                                    4

1      were provided to you by counsel for JMM?

2           A.    No, I didn't.

3           Q.    And in giving your opinions in this case and

4      the opinions that you intend to give in this

5      deposition today, did you rely on all of the

6      materials provided to you?

7           A.    To various degrees.  I mean, I have looked

8      them all over.  Of course some are more important

9      than others to my testimony, anyway.

Page 4

Exhibit 3 - 1118BerrymanDraft

10          Q.    Sure.   You prepared a report in this case,

11     correct?

12          A.    Yes.

13                          MR. IOLA:   And Madam Court

14          Reporter, I'm going to go ahead and mark the

15          Notice of Deposition as Exhibit 1, Mr. Berryman's

16          Curriculum Vitae as Exhibit 2, and Mr. Berryman's

17          Report as Exhibit 3.   I'm not sure if I need to

18          sent that to you, but I'm sure we'll work it out

19          at the end.

20     BY MR. IOLA:

21          Q.    Mr. Berryman, who would you speak with in

22     preparation for your testimony today?

23          A.    Ryan Browning.

24          Q.    Okay.   Have you discussed your proposed

25     testimony with anybody else?


♀                                              5


1           A.    I don't think so.

2           Q.    Okay.   Now you're charging a fee for your

3      testimony in this case, correct?

4           A.    Yes.

5           Q.    You charge $245 an hour for all preparation

Exhibit 3 - 1118BerrymanDraft

6    and review prior to a deposition or trial; is that

7    right?

8         A.   That's right.

9         Q.   And how many hours did you charge for the

10   preparation and review in this case?

11        A.   Well, I would have to -- I would have to get

12   all the time sheets out and add them up.  But if I

13   had to give you a range, as I sit here, I would say

14   it's somewhere on the order of 15 to 20 hours total.

15        Q.   Okay.  You also charged $375 an hour for

16   testimony at trial and depositions, correct?

17        A.   Yes.

18        Q.   Okay.  On your on your Curriculum Vitae,

19   which has been marked as Exhibit 2, you list the

20   previous depositions and court appearances.  Is this

21   a complete and accurate account of all the times you

22   have testified in a deposition or in court?

23        A.   No.  What you see shown there is accurate

24   for the last four years.

25        Q.   And approximately how many depositions or

♀                                                        6

Page 6

Exhibit 3 - 1118BerrymanDraft

1   testimony in court have you given prior to that

2   four-year period, prior to the last four years?

3        A.   Somewhere on the order of 60 occasions, plus

4   or minus, in addition to the ones that are shown on

5   the CV that you're looking at.

6        Q.   Okay.  Does the list on your CV include

7   cases where you were retained but did not ultimately

8   testify or only cases where you testified?

9        A.   Only cases where I testified, either

10  deposition or trial.

11       Q.   Approximately how many additional cases were

12  you retained as an expert but did not testify?

13       A.   For what time period?

14       Q.   Over the same time period of the -- let's

15  say the last four years as articulated in your CV.

16       A.   Well, it would certainly just be an

17  approximation as I sit here.  But in addition to

18  what's shown on the CV of cases, number of cases, I

19  would say somewhere on the order of, you know, as

20  many as 400 to 500 additional occasions.

21       Q.   Okay.

22       A.   Over a four-year period.

23       Q.   And how many times have you been retained by

24  an party in asbestos litigation?

Page 7

Exhibit 3 - 1118BerrymanDraft
25          A.    Just -- I wouldn't know.  I would have to


♀                                                         7


1          go -- I would have to go research the files in order

2          to give you an accurate answer on that.

3               Q.    Well, let me try this a different way.

4          What -- approximately what percentage of all of the

5          either being retained as an expert or testifying as

6          an expert, what percentage of that is asbestos

7          litigation as opposed to other litigation?

8               A.    I would say that asbestos litigation makes

9          up probably somewhere on the order of 5 to 10 percent

10         of my overall practice.

11              Q.    Okay.  What is the total amount of money you

12         have made in your career testifying in asbestos

13         litigation?

14              A.    I don't know.

15              Q.    And how many times have you been -- please

16         strike that.

17                    Of the times that you have testified or been

18         retained in asbestos litigation, what percentage of

19         the time are you retained by a defendant as opposed

20         to a plaintiff?

                              Page 8

Exhibit 3 - 1118BerrymanDraft

21    A.   I haven't analyzed that, but if I -- best

22    way to answer that is primarily I am hired by the

23    defense not the plaintiff.

24    Q.   Have you ever been hired by a plaintiff in

25    asbestos litigation?


♀                                              8


1     A.   Not that I can recall.

2     Q.   Okay.  Now, how many separate defendants

3     have retained you in asbestos litigation over your

4     career?

5     A.   I would say, just off the top my head

6     without research, I would say three to five.

7     Q.   Okay.  Have you worked for JMM before?

8     A.   Yes.

9     Q.   How many times have you been retained for

10    your services by JMM?

11    A.   Well, I wouldn't know the answer to that

12    without additional research of the files, but a range

13    would probably be somewhere in the vicinity of 25 to

14    35 times.

15    Q.   Okay.  How did you begin your career as a

Page 9

Exhibit 3 - 1118BerrymanDraft

16      person retained to -- who's been retained to testify

17      in asbestos litigation?

18          A.   Somehow a firm, which I believe was located

19      in Washington, D.C., had made contact with local

20      counsel here in Oklahoma City who had hired me on

21      many occasions in the past and recommended me to the

22      D.C. firm, and that's basically how I got started.

23          Q.   And who was the first defendant to retain

24      you in asbestos litigation, if you can remember?

25          A.   I can't remember that.  I would have to

♀                                                    9

1       research it to give you an answer.

2           Q.   Do you remember when the first defendant

3       retained you in asbestos litigation?

4           A.   No, I would have to -- I would have to

5       research that to give you an accurate answer.

6           Q.   Okay.  Were you still working as a general

7       contractor when you were first retained to testify in

8       asbestos litigation?

9           A.   Yes.

10          Q.   And are you currently still working as a

11      general contractor?

Page 10

Exhibit 3 - 1118BerrymanDraft

12      A.   Yes.

13      Q.   What percentage of your income can be

14   attributed to your being retained or testifying in

15   asbestos litigation versus your work as a general

16   contractor?

17      A.   Gosh, that's a -- that's a hard question to

18   answer without quite a bit of research.

19      Q.   Even -- do you have an approximation?

20      A.   I would say if you -- if you took our yearly

21   business volume, it might represent somewhere -- it

22   would be less than 5 percent.  That's probably a good

23   answer, less than 5 percent.

24      Q.   Okay.  Mr. Berryman, have you ever spoken at

25   any conferences or seminars for defense attorneys who

♀                                                      10

1   defend clients in asbestos litigation?

2      A.   Yes.

3      Q.   What conference or seminar -- what

4   conferences or seminars have you spoken at?

5      A.   It was at the Perrin^ conference in Miami,

6   Florida.

Page 11

Exhibit 3 - 1118BerrymanDraft

7          Q.    Okay.   How many times have you spoken at the

8     Perrin conference?

9          A.    One time.

10         Q.    And when was that?

11         A.    I would need to do some research to be able

12    to tell you exactly when, but in the last four years.

13         Q.    Okay.   And what was your -- what was the

14    topic that you presented at the Perrin conference?

15         A.    I don't recall the exact name of the topic,

16    but it was -- the subject matter was concerned

17    construction sequencing.

18         Q.    What is construction sequencing?

19         A.    Construction sequencing is a discipline

20    concerning just what it says, the sequencing of

21    construction activities that construction of a

22    building or a construction of a ^large follows a

23    relatively predictable sequence of events.   That's

24    basically it.

25         Q.    Have you ever been through a mock trial,


♀                                                        11


1     mock cross-examination or a mock deposition at a

2     defense firm, at the request of a defense firm?

                          Page 12

Exhibit 3 - 1118BerrymanDraft

3          A.    No.

4          Q.    Outside of opinions given in anticipation of

5    litigation, has anyone ever asked you for your expert

6    opinion on asbestos exposure?

7          A.    I am not sure.

8          Q.    Okay.  Now, Mr. Berryman, I would like to

9    direct your attention to your Curriculum Vitae.  I

10   assume you have that in front you.  On the second

11   page of your report, you state that you've worked as

12   a general contractor for over 30 years, correct?

13         A.    Actually, it says -- talking about the CV or

14   are you talking about the report itself?

15         Q.    Oh, excuse me, you're right; that is on the

16   report.

17               So, yes, yes, on the report, you state that

18   your opinions are based on your review of the

19   documentation and your 36 years of experience as a

20   general contractor; is that right?

21         A.    Yes.

22         Q.    So you would agree that some general

23   principles apply to certain categories of jobs,

24   correct?

25                         MR. BROWNING:  Objection.


Page 13

Exhibit 3 - 1118BerrymanDraft

1          THE WITNESS:  I think -- I think

2     that's accurate.

3  BY MR. IOLA:

4     Q.   You would also agree --

5     A.   I think it might depend more on your

6  specific question.

7     Q.   Sure.  Well, let's take general contracting

8  work, for example.  You would agree that there are

9  certain principles in general contracting that apply

10  from work site to work site irrespective of the

11  location of the work site, for instance?

12     A.   Yes.

13     Q.   But you would also agree that each work site

14  is different in some capacity; is that right?

15     A.   Well, there's certainly differences of how a

16  site might be laid out, the footprint of the building

17  itself, I mean, there are differences, but a number

18  of commonalities at the same time.

19     Q.   Sure.  Now, the only work sites where you

20  know that certain actions were taken or weren't taken

21  on that work site was if you actually worked there or

Exhibit 3 - 1118BerrymanDraft

22      visited them during working hours; is that right?

23          A.   Well, no, in the classical sense of no did I

24      observe it with my own eyes, did I -- was I there

25      personally.  If that what you mean by your definition

♀                                                    13

1       of "no," then, yes, the only way I could know in that

2       sense is to be there.

3           Q.   Okay.  So for work sites that you have not

4       personally visited and that you have not personally

5       seen with your own eyes, as you stated, you're

6       limited to speaking in terms of probabilities or

7       likelihoods; is that right?

8           A.   I would talk in terms of probabilities,

9       likelihoods, expressing what are the common practices

10      regardless of time and location, what are industry

11      standards, regardless of time and location.

12          Q.   Okay.  Now, as a general contractor in your

13      36 years of experience, how many job sites, in your

14      career, have you been on?

15          A.   Numerous.  I wouldn't -- I am not even sure

16      I could figure out how many there's been but I can

17      tell you it's a large number.

                        Page 15

Exhibit 3 - 1118BerrymanDraft

18    Q.   Would it be more likely to be in the

19    hundreds or the thousands or tens of thousands?

20    A.   I would say certainly in the thousands.  I

21    would say, if I had to make an educated guess, I

22    would say somewhere between 7,000 and 10,000.

23    Q.   Okay.  Now, on this page, page two of your

24    report, you don't list any of the work sites that you

25    worked at during your career as a general contractor,


♀                                              14


1    correct?

2    A.   That's right.

3    Q.   Also on this page, you don't say what work,

4    if any, specifically pertain to asbestos-containing

5    pipe.

6    A.   No.  Actually, what you see on page two is

7    just a listing of the documents.  That doesn't have

8    anything to do with my personal experience.

9    Q.   Oh.  Well, on any of the documents that

10    you've provided prior to your testimony, whether that

11    is the Curriculum Vitae, the report, or the e-mails

12    and notes that have been provided, do you at any

Page 16

Exhibit 3 - 1118BerrymanDraft

13    point list the work sites that you had experience on

14    as a general contractor where the focus was work on

15    asbestos-containing pipe?

16         A.    No.

17         Q.    Now, what specific work, as a general

18    contractor, do you believe is a relevant to your

19    opinion about a salesman's exposure to asbestos from

20    asbestos-containing pipe?

21         A.    Well, I think importantly here, Mr. Lee has

22    represented that he was a salesman and that he, in

23    the capacity of his jobs responsibilities, he

24    interfaced on a regular basis with engineers and

25    construction personnel that would have been

♀                                                              15

1    responsible for procuring his pipe.  He sold to those

2    people, and that is the same or similar to what I

3    have done in my own career in terms of meeting with

4    engineers on one hand and receiving bids from

5    material men and subcontractors as a project manager

6    and general contractor on the other end of the

7    spectrum.  And so I'm very familiar with the daily

8    process that he would have gone through as a salesman

Page 17

Exhibit 3 - 1118BerrymanDraft

9    and interfacing with those two entities in selling

10   his pipe.

11       Q.   Now, when you were interfacing with

12   engineers and you received bids, were you doing that

13   in your capacity as a general contractor or as a

14   salesman?

15       A.   In my capacity as a general contractor but

16   interfacing with the people that are in the sales

17   business, because obviously people approach our firm

18   on a regular basis to solicit our work in the

19   purchases of materials and/or subcontract labor.

20       Q.   Okay.  Now, in that career and in that

21   interfacing, on which job sites, at any point in your

22   career, did you interact with vendors or salespeople

23   who were selling asbestos-containing pipe or even on

24   a work site where asbestos-containing pipe was being

25   worked on?

♀                                              16

1        A.   Well, I can't recall interfacing with

2    someone specifically selling asbestos-containing

3    pipe, but I do have lots of experience interfacing

Page 18

Exhibit 3 - 1118BerrymanDraft

4       with salespeople that would have been selling all

5       forms of pipe, just like Mr. Lee testified that he

6       did.

7           Q.   Do you have any specific recollection of a

8       specific work site on which you would have interfaced

9       with -- either interfaced with someone who was

10      selling asbestos-containing pipe or were around

11      people who were working on asbestos-containing pipe

12      at any point in your career?

13          A.   I can't recall one.

14          Q.   Okay.  Now, is it your testimony today that

15      your interfacing with salespeople gives you an

16      understanding of the types of job duties and

17      responsibilities that a salesperson like Mr. Lee

18      would have had throughout his career at Underground?

19          A.   Well, perhaps not all of their duties stem

20      to stern.  I mean, I don't know what their paperwork

21      responsibilities were back at the home office, so to

22      speak.  But I am in a unique position to offer

23      testimony on what most likely happened, how did he

24      conduct himself, where did he go when he arrived at

25      the site, what was his mission, how would he

Page 19

Exhibit 3 - 1118BerrymanDraft

17

♀

1    accomplish his mission.  That I am able to testify

2    about.

3         Q.   And your testimony on those issues comes

4    from your experience as a general contractor and any

5    training which you might have had, correct?

6         A.   Yes.

7         Q.   Now, in your career, did you ever follow a

8    salesperson around their job to see what their job

9    duties included, where their work required them to

10   be, or any shadowing of a salesperson at any time?

11        A.   Sure, I have had -- I have had many

12   salespeople work in a similar capacity as Mr. Lee.

13   They were responsible for meeting with architects,

14   engineers, picking up plans and specifications,

15   understanding plans and specifications, doing

16   take-offs as Mr. Lee described that he did,

17   organizing bid proposals, submitting those bid

18   proposals.  I have been involved in that process

19   myself, by myself.  I have been involved in that

20   process working with one or more individuals every

21   step of the way in that process.

22        Q.   Approximately how many salespeople would you

23   say you have shadowed or followed to understand their

Page 20

Exhibit 3 - 1118BerrymanDraft

24    job duties and responsibilities?

25          A.    I would say it's on the order of between 15

♀                                                        18

1    and 20.

2          Q.    Now, at any point, did you take a survey of

3    those 15 to 20 salespeople as to their job duties and

4    responsibilities?

5          A.    No.

6          Q.    Now, I want to switch gears here a little

7    bit for a second.   If I could have you turn to your

8    Curriculum Vitae, and let me know when you are there,

9    please.

10          A.    Okay.

11          Q.    Now, Mr. Berryman, under on your Curriculum

12    Vitae under Formal Education, this shows that your

13    only formal education is a Bachelor's degree in

14    biology; is that correct?

15          A.    Bachelor's degree in molecular biology, yes.

16          Q.    Molecular biology.   Excuse me.

17                Would a degree in molecular biology be

18    integral to your job as a general contractor?

Page 21

Exhibit 3 - 1118BerrymanDraft

19    A.    Yes, very much so.  Not so much -- not so

20    much what I learned in the particular discipline

21    itself, but as you can imagine, that is a hard

22    science at a very competitive university, and so the

23    rigor and the curriculum that you go through to

24    obtain that degree is very intense, and it sharpened

25    my analytical skills.

♀                                                    19

1    Q.    So essentially, what you're saying is it's

2    the rigor of going through the process of obtaining

3    the degree allowed you to apply that in your

4    professional life'; is that right?

5    A.    Yes, that coupled with, you know, as you can

6    imagine, to obtain a degree, you have to have

7    significant training in mathematics, and so that's an

8    area where there is a direct relationship between

9    what I learned and what I use in my business life on

10    a daily basis.

11    Q.    Was there anything -- was there any course

12    work that went into obtaining your degree in

13    molecular biology that substantively aided your

14    career as a general contractor?

Page 22

Exhibit 3 - 1118BerrymanDraft

15          A.   I don't think so.

16          Q.   Now, one of the documents provided to you by

17    defense counsel that's on your reliance list was the

18    or the report by Dr. Holstein; is that correct?

19          A.   Yes.

20          Q.   And you have reviewed Dr. Holstein's report

21    in this case; is that right?

22          A.   Yes.

23          Q.   You would agree that Dr. Holstein is a

24    certified industrial hygienist; is that correct?

25                         DEFENSE ATTORNEY:   Objection.


♀                                              20

1                         THE WITNESS:  I don't know.  Would

2          have to look that up.

3     BY MR. IOLA:

4          Q.   Well, you are not a certified industrial

5     hygienist; is that right?

6                         DEFENSE ATTORNEY:  Objection.

7                         THE WITNESS:  I am not.

8     BY MR. IOLA:

9          Q.   You have taken no formal coursework in

Page 23

Exhibit 3 - 1118BerrymanDraft

10      industrial hygiene?

11          A.   That's true.

12          Q.   You have received no certificates to suggest

13      that you have received any training in industrial

14      hygiene.

15          A.   That's correct.

16          Q.   Is there any course work or formal training

17      that you have gone through that helped in the

18      identification of workplace hazards and preventative

19      methods?

20          A.   Yes in the course of obtaining a licensure

21      in various states in the United States, there are --

22      there is coursework required to educate and

23      familiarize one with safety standards, particularly

24      OSHA standards, and I have participated in that

25      coursework.


♀                                            21


1           Q.   Besides the education on OSHA standards,

2       what other information have you received as a result

3       of that licensure process that pertains to

4       identification of workplace hazards or preventative

5       methods?

Page 24

Exhibit 3 - 1118BerrymanDraft

6       A.    Perhaps an understanding of the nature of

7    MSDS, sheets or material.

8       Q.    Okay.  Now, you are not an expert in the

9    state-of-the-art as it relates to asbestos diseases;

10   is that right?

11      A.    That's correct.

12      Q.    Now, one of the other documents provided to

13   you by defense counsel in preparation of your

14   deposition, and that appears in your reliance list,

15   is a report by Dr. Maddox; is that correct?

16      A.    Yes.

17      Q.    And you would agree that Dr. Maddox is a

18   pathologist; is that right?

19      A.    I don't know that.  I would have to get his

20   report out and check.

21      Q.    Okay.  But you are not a pathologist or a

22   medical doctor of any kind; is that correct?

23      A.    That's correct.

24      Q.    You would have no basis to dispute

25   Dr. Maddox's opinion that Larry Lee has mesothelioma,

♀                                                  22

Page 25

Exhibit 3 - 1118BerrymanDraft

1   correct?

2       A.   Correct.

3       Q.   And you would have no basis to dispute the

4   opinion that mesothelioma is caused by asbestos

5   exposure; is that correct?

6                   DEFENSE ATTORNEY:  Objection.

7                   THE WITNESS:  Yes.

8   BY MR. IOLA:

9       Q.   Okay.  Now, Mr. Berryman, now I would like

10  to turn to your report, and if you can just let me

11  know when you have that in front of you.

12      A.   Yes, I am ready.

13      Q.   Okay.  Did anybody help you prepare this

14  report?

15      A.   No.

16      Q.   Did you author this report by yourself in

17  its entirety?

18      A.   Yes.

19      Q.   Does your report contain all of your main

20  conclusions in this case?

21      A.   Yes.

22      Q.   So you do not expect to give any additional

23  testimony not contained in this report if you were

24  asked to give additional testimony at a later time in

Page 26

                    Exhibit 3 - 1118BerrymanDraft
25          this case; is that right?


♀                                                23


 1          A.   I think that's correct, unless there is some

 2     sub-opinion that would come from this or if someone

 3     was to ask me at deposition or trial to offer

 4     examples that would be in keeping with some of the

 5     opinions that I have given or the basis for the

 6     opinions, I would be able to offer further

 7     explanation and/or examples to support what I have in

 8     my report.

 9          Q.   And in fact, in the report, you have

10     reserved the right to supplement the report as

11     needed; is that right?

12          A.   Well, I have reserved the right to

13     supplement if I received additional information that

14     might affect my opinions.

15          Q.   I understand.

16          Mr. Berry man you don't personally know

17     Larry Lee, correct?

18          A.   That's correct.

19          Q.   You have never worked with him at any point

20     during his working life?

                         Page 27

Exhibit 3 - 1118BerrymanDraft

21          A.    Not that I know of.

22          Q.    You have never visited any of the work sites

23    he worked at as a salesman for Underground?

24          A.    That's right.

25          Q.    And in your work as a general contractor,


♀                                                    24


 1    you never occupied the same job title, position or

 2    responsibilities as Mr. Lee, correct?

 3          A.    Certainly not the same title or not the same

 4    position, and I'm sure not the exact

 5    responsibilities, but as I have mentioned previously,

 6    a number of the responsibilities and job duties and

 7    responsibilities that he had or same or similar to

 8    what I have experienced personally and had worked

 9    with others in my firm to undertake.

10          Q.    Mr. Berryman, you never, on a day-to-day

11    basis throughout your career as a general contractor,

12    were a salesman for a company like Underground in a

13    same or similar capacity as to what Mr. Lee did

14    throughout his career?

15          A.    Well, I certainly did not.  I was not a

                          Page 28

Exhibit 3 - 1118BerrymanDraft

16    salesman of piping products, whether it be AC pipe,

17    ductal iron, PVC, copper.  I have not been a salesman

18    of pipe.

19        Q.    Okay.  Have you received any training as a

20    salesperson period?

21        A.    No formal training.

22        Q.    Okay.  And you have never worked with any of

23    the co-workers of Mr. Lee, right?

24        A.    Not that I know of.

25        Q.    Okay.  Well, I would like to go through your

♀                                                    25

1     opinions one by one.  We'll go ahead and start with

2     the first opinion.

3             Your first opinion is that:  As a

4     salesperson for Underground it is highly likely that

5     Lee interfaced with the installation contractors and

6     engineers away from where AC pipe was being installed

7     or cut; is that correct?

8         A.    Yes.

9         Q.    Now, your first basis for this opinion is

10    that -- is that it was typical in the construction

11    industry for vendors to stay only in the corporate

                           Page 29

Exhibit 3 - 1118BerrymanDraft

12       office; is that right?

13          A.  Well, I don't say "only."  But I do say that

14       it's of the typical construction industry that those

15       meetings to review plans and specifications,

16       materials and so forth, take place in a corporate

17       office, and I say it's not -- it's -- not most often

18       it's not located near the site.  Now, occasionally it

19       is at the site in what would be known as a job site

20       trailer where people con office-type activities in a

21       remote office that is on the site but still an office

22       setting.

23          Q.  Now, you would agree that Mr. Lee, in his

24       deposition, testified to the contrary; that he would

25       have been interacting with the pipe installation

♀                                   26

1       contractors and engineers at least on a weekly basis,

2       correct?

3          A.  Well, that's not what he says.  He talks

4       about interfacing.  I'm sorry.

5          Q.  Please continue.

6          A.  He talks about interfacing with the

Page 30

Exhibit 3 - 1118BerrymanDraft

7       engineers, going to their offices in order to pick up

8       plans and specifications and review plans and

9       specifications that have a different activity from

10      his description of going on the job site on a weekly

11      basis to meet with a -- some person, some staff

12      person as a general contractor or plumbing

13      contractor, utility contractor that would have been

14      installing the line.

15          Q.    And what is the -- what is the basis for

16      your belief that Mr. Lee's testimony was inaccurate

17      as to the first opinion?

18          A.    Well, because, based on my experience,

19      engineers are typically not out in the field; they're

20      in their office, they -- the tools of their trade

21      require an office setting.  They have to do

22      calculations, they need a clean workspace, they need

23      manuals to refer to.  This day and age, much of their

24      work is done on a computer.  It's just -- it's

25      unreasonable to think that an engineer would just be

♀                                                        27

1       out in the field kind of working on the back tailgate

2       of his pickup, you know, on a job site, that --

Page 31

Exhibit 3 - 1118BerrymanDraft

3    engineers just don't do that.  If there was a

4    engineer on site, he would be in a -- in a remote job

5    site office trailer.

6         Q.   Now, your the basis for your opinion is

7    essentially only stemming from your experience as a

8    general contractor, correct?

9         A.   Yes, my experience as a general contractor

10   and being able to say that I can't think of a single

11   occasion when I would have interfaced with an

12   engineer on site in order to obtain plans and

13   specifications or discuss plans and specification

14   force an upcoming project.

15        Q.   Now, even though you are saying that you

16   can't think of a single time where you saw that sort

17   of activity, you still have to use the term likely

18   and typical in our opinion number one because you

19   cannot definitively dispute Mr. Lee's testimony,

20   right?

21        A.   Well, I can't say that never in the history

22   of the United States as an engineer and not met with

23   a piping contractor on some site to discuss plans and

24   specifications.  Is that possible?  Well, sure,

25   sometime in the last 200 years it could have

Page 32

Exhibit 3 - 1118BerrymanDraft

1    occurred.  But if you ask me what happens on a daily

2    basis, coast to coast, whether it's 1940, 1960 or

3    2015, engineers, in their environment and their tools

4    of the trade and the drawing that they need to have

5    on hand and the manuals that they have and the

6    calculations that they need to perform, et cetera,

7    are done in an office, and if somebody wants to talk

8    to that engineer about an upcoming project, the

9    specifications, the size of the pipe, what's planned,

10   what's best, what product lines are available, et

11   cetera, that's done in the engineer's office or an

12   office setting.  It's not done in the field, it's

13   certainly not done on the back of his pickup truck.

14        Q.   So if Mr. Lee had testified to the contrary,

15   is your position that Mr. Lee is a liar?

16        A.   I don't I think with respect to the

17   engineer, he does not say he met an engineer in the

18   field.  And so if he -- if it is his testimony that

19   he did meet an engineer in the field, I would believe

20   that, first of all, that would be a very rare, if

21   ever blue moon occurrence, and perhaps he is, at that

Exhibit 3 - 1118BerrymanDraft

22    point in his life, misremembering what occurred.

23        Q.   Okay.  Well, let's turn to the second

24    opinion.  Your second opinion is that:  It is likely

25    that Mr. Lee was mistaken in his description of

1    having been near cutting of AC pipes during his time

2    as a salesman for Underground; is that correct?

3        A.   Yes.

4        Q.   Now, what specific instances, in your

5    experience as a general contractor, leads you to this

6    opinion?

7        A.   Well, enough specific experiences that the

8    installation of any piping is a -- goes in a more or

9    less linear fashion and so the pipe is always

10    advancing.

11            And so in the case of Mr. Lee where he

12    described that there were jobs he sold that were

13    between 2,000 and 7,000 feet, you have got to imagine

14    that that, in the 2,000 square foot -- or lineal foot

15    scenario, that's almost a half mile, and the 7,000

16    that's almost a mile and a half.  And when you place

17    the pipe end-to-end in 13-foot sections and continue

Page 34

Exhibit 3 - 1118BerrymanDraft

18      that at the rate of 400, 500 feet per day at the head

19      of the line where any cutting could possibly be done,

20      is always advancing, so it would always be moving

21      away.  And the notion that a salesman would show up

22      ate job site and get out to interface with management

23      construction personnel and then walk half mile to a

24      mile just to see what's going on at the end of the

25      pipe is not reasonable.


♀                                                         30

1           Q.   Now, what do you mean by it "is not

2      reasonable"?

3           A.   Well, it's just not -- there wouldn't be any

4      reason for it, first of all.  I mean, as Mr. Lee

5      said, his reason for visiting the job site was to

6      basically show the flag, show his customer that he

7      was interested, care about what was going on and to

8      make sure that the AC pipe that had been sent

9      directly from the manufacturer, or any pipe for that

10      matter, that had been sent by the manufacturer direct

11      to the job site, was the appropriate pipe.

12                Well, you don't have to walk a half mile or

Page 35

Exhibit 3 - 1118BerrymanDraft

13       a mile to the head of the advancing line to look at

14       the pipe storage yard to make sure that the material

15       that was sent was appropriate.

16            Q.   Now, even if it is in your opinion

17       unreasonable, what about it being unreasonable leads

18       you to believe that it simply did not happen?

19            A.   Well, again, I suppose it's possible,

20       anything is possible.  But if you were to ask me if

21       it's likely, I would look at that -- I would answer

22       that, first of all, logically.  It makes no sense,

23       and I would have a hard time believing that a person

24       would, for instance, walk a mile through some pretty

25       harsher terrain to travel ahead of a line just to

♀                                                          31

1        make sure it was being installed properly.  Because,

2        personally, you have got to realize, a salesperson of

3        pipe is not involved in the quality control of how

4        the pipe's being installed; that's completely up to

5        the contractor.  So there is no reason for him to go

6        look at it from an installation quality control

7        standpoint.  There is no reason for him to -- there's

8        better and easier ways to demonstrate to your client

                              Page 36

Exhibit 3 - 1118BerrymanDraft

```
 9      that you're interested in the project and that you

10      appreciate their business.  There's easier ways to

11      determine if the right pipe was sent to the job in

12      the first place.  You don't have to walk a mile to go

13      figure those things out.

14              And when you think about a person that's on

15      a commission sales, he doesn't make money walking a

16      mile to look at the head of the line; he makes money

17      by producing sales, and that means he goes on to the

18      next job as soon as he can.

19      Q.   For the works sites where Mr. Lee recalls

20      being near the cutting of AC pipe while he's employed

21      as a salesman, do you contest the existence of him

22      being near that AC pipe or simply just the frequency?

23      A.   Well, again, there is no way to say that

24      it's impossible.  It's just improbable.  And on two

25      accords, as I have explained already, it's improbable
```

♀                                                        32

```
 1      the things that I have already -- for the reasons I

 2      have already stated.

 3              And it's also improbable -- well, I would
```

Page 37

Exhibit 3 - 1118BerrymanDraft

4     say primarily from that standpoint that he's -- he

5     doesn't have any reason to be around the cutting of

6     pipe as the line was being put in.

7          Q.   You were not at any of these job sites where

8     Mr. Lee claims he was exposed to the cutting of AC

9     pipe, correct?

10         A.   That's correct.

11         Q.   Okay.  Do you have any opinion on the

12     frequency of exposure to asbestos from the cutting of

13     AC pipe that is required to cause mesothelioma?

14         A.   No, but I do have an opinion, of course,

15     I've stated in my opinion too, in basis 2.3, I do

16     have an opinion about the frequency as Mr. Lee stated

17     it in his testimony, and that is that on twice a year

18     he sold AC pipe, the size of -- length of line ranged

19     from 2,000, 7,000 lineal feet.  Based upon the 400 to

20     500 lineal feet being installed per day that he

21     quoted, just doing the mathematics on that, it would

22     place him at the site over each year somewhere

23     between five and 18 workdays.

24         Q.   What is the -- what, if any, evidence do you

25     have to support the claim that even frequency of

Exhibit 3 - 1118BerrymanDraft

33

1    exposure to asbestos from the cutting of AC pipe

2    would not be enough to cause the development of

3    mesothelioma?

4                         MR. BROWNING:  Objection.

5                         THE WITNESS:  I don't have an

6        opinion on that.

7    BY MR. IOLA:

8        Q.    Okay.  Have you ever -- have you ever been

9    around the cutting of asbestos cement pipe that you

10   can recall with any specificity?

11       A.    Not with specificity, no.

12       Q.    Okay.  Now, we can go ahead and turn to your

13   last opinion.  The third opinion is that:  It is

14   likely that, as a salesperson from Underground, Lee

15   was knowledgeable in the standard practice and

16   procedures for AC pipe, including OSHA, yet did not

17   pay attention the guidelines; is that correct?

18       A.    Yes.

19       Q.    Are you an expert on OSHA?

20       A.    I would consider myself an expert, yes.

21       Q.    Have you had occasion to speak with the

22   Department of Labor on the development of any OSHA

23   rules?

                            Page 39

Exhibit 3 - 1118BerrymanDraft

24     A.   No.

25     Q.   Have you ever spoken with OSHA itself?


♀                                          34


1      A.   Yes.

2      Q.   What was the content of those conversations

3   that you had with OSHA and when were they?

4      A.   I would just be about job site safety

5   conditions, working as a general contractor, and they

6   would have occurred over the -- basically over of the

7   last 20 years from time to time.

8      Q.   So you have not participated with OSHA in

9   the development of any formal rule making as laid

10   forth in the Federal Register; is that right?

11     A.   That's correct.

12     Q.   Have you created any literature on OSHA or

13   workplace safety?

14     A.   No.

15     Q.   Now, what if, any, other experiences as a

16   general contractor makes you believe that you are an

17   expert on OSHA?

18     A.   Well, I would just point to my, you know,

Exhibit 3 - 1118BerrymanDraft

19      over three decades experience as a general

20      contractor.  Of course I'm charged with the

21      responsibility of knowing OSHA and adhering to them

22      in my business practices, making sure it's followed

23      by my employees over the course of a long period of

24      time in many different venues.

25          Q.   So you're experience with OSHA is in terms


♀                                                      35

1      he have complying with OSHA rules and rule making; is

2      that right?

3          A.   Yes, understanding what's in OSHA, what are

4      employer's responsibilities under OSHA, what should I

5      do on a daily basis to make sure that my employees

6      are operating safety.

7          Q.   And as an expert on OSHA, you're familiar

8      with all of the federal regulations promulgated gated

9      by OSHA as it pertained to asbestos; is that correct?

10         A.   Yes.  But to say I would be able to, you

11      know, quote them chapter and verse, sometimes with a

12      federal regulation as large as it is, oftentimes I

13      find I need to consult with the text in order to be

14      sure what the regulations are.

Page 41

Exhibit 3 - 1118BerrymanDraft

15    Q.   In your opinion, what differentiates an

16    expert from a lay person?

17         MR. BROWNING:  Objection.  You can

18    answer.

19         THE WITNESS:  Well, I think a lay

20    person would be just what you might call the man

21    on the street, just the average person that --

22    that would be of average knowledge about an

23    average number of subjects like -- like the vast

24    majority of Americans might be; for instance,

25    whereas an expert is someone who has spent

♀                                                    36

1    considerable time in a certain discipline, has

2    considerable experience not only from an academic

3    standpoint but from a hands-on experience

4    standpoint.  And to go further, a person that

5    would -- an expert would be someone who has gone

6    further and actually spent time in specific study

7    of the attributes, characteristics, aspects of

8    the work that they practice and have knowledge

9    of.

Page 42

Exhibit 3 - 1118BerrymanDraft

10    BY MR. IOLA:

11         Q.   And as an OSHA expert, you have certainly

12    spent that time learning the OSHA rules governing

13    exposure to asbestos; is that right?

14         A.   Among other things, yes.

15         Q.   Okay.  Then as an OSHA expert, please tell

16    me what the -- what the specific violations of OSHA

17    regulation you see Mr. Larry Lee having done

18    throughout his career at Underground.

19         A.   Well, I can't -- I don't know all the times

20    he might have violated OSHA during his career.

21         Q.   Well, your opinion is that Mr. Low would

22    have violated OSHA standards, correct?

23         A.   Well, I don't say that.

24         Q.   Well, in your third opinion, the last line

25    says:  His description of -- that being Lee -- of the


♀                                                37


1     pipe cutting does not comport with the OSHA

2     guidelines in place during the time he worked at

3     Underground.

4              Can you please explain that sentence a

5     little bit more thoroughly.

                          Page 43

Exhibit 3 - 1118BerrymanDraft

6      A.   Okay.  Sure.  I mean, the best place to look

7      is under basis 3.2 where, over time, and certainly

8      during the time period that he says that he was

9      exposed to J-M Manufacturing pipe, there were other

10     than an rules in place that outlawed the use of a gas

11     powered saw using a carborundum disc blade to cut

12     asbestos pipe, unless that same tool was outfitted

13     with localized ventilation exhaust or in itself was a

14     ^douty tool.  And so that is the regulation that was

15     in place.  And obviously, if someone was cutting pipe

16     with a gas powered saw with a carborundum blade and

17     creating dust that was being relaced into the

18     atmosphere, that that was against OSHA guidelines.

19      Q.  And as an expert on the OSHA guidelines, you

20     would agree that there were certain -- that there

21     were regulations, at least by 1972, regarding the

22     placing -- the placement of warning information on

23     products that contained asbestos; isn't that right?

24      A.  I would need to check that.  I'm not sure

25     that that's right.  I'm not sure that that was part

♀                  38

Case 5:13-cv-00826-FL   Document 263-3   Filed 11/24/15   Page 45 of 56

Exhibit 3 - 1118BerrymanDraft

1    of OSHA.

2         Q.   So are you or are you not familiar with the

3    OSHA standards promulgated governing asbestos

4    exposure from 1971 forward?

5         A.   Well, I would consider myself familiar with

6    it, but to be able to, you know, answer a question

7    like that where you pluck something out of time, you

8    know, is it or is it not true that warning labels had

9    to be put on products or people had to be advised

10   40 years ago, I mean, that's something that I would

11   have to research to give you an accurate answer.

12        Q.   You would agree that to be an expert in

13   something, you need more than mere familiarity; is

14   that right?

15        A.   Yes, I think so.

16        Q.   And it's your position that you only have

17   that level of familiarity in regards to the rules and

18   regulations promulgated by OSHA from 1971 forward

19   concerning asbestos exposure?

20        A.   No, absolutely not.

21        Q.   Okay.  And as you sit here today, you can't

22   tell -- you can't tell me one way or another whether

23   warnings were required on products at any point in

24   time that contained asbestos?

                    Exhibit 3 - 1118BerrymanDraft
25          A.   I know that they were required what.   I

1          don't know is if that first came into being through

2          OSHA and whether it happened in 1971 or 1972.

3                I am familiar with OSHA and what's in it,

4          what it does, what it's about, how to use it, but to

5          be able to recall with specificity the history of the

6          rule making when various provisions came into effect

7          and so forth, I wouldn't be able to do without

8          further research.

9          Q.   Okay.  So you couldn't, for instance, tell

10         me what the permissible exposure level for asbestos

11         was in 1971, correct?

12                    MR. BROWNING:  Objection.

13                    THE WITNESS:  I have an idea, but

14              to be accurate, I want to look at it.

15         BY MR. IOLA:

16         Q.   Okay.  And as you sit here today, you can't

17         tell me, as an OSHA expert, what the permissible

18         exposure level was for asbestos in 1972?

19         A.   Well, I believe it was ^12 fibers per cubic

20         centimeter as an eight-hour time-weighted average.

                          Page 46

Exhibit 3 - 1118BerrymanDraft

21      Q.   And when was the next -- when was that

22   permissible exposure level changed next by OSHA?

23      A.   I would need to research that to give you an

24   accurate answer.

25      Q.   Okay.  Are you aware if JMM provided

♀                                        40

1   warnings on their asbestos-containing products at any

2   point in time?

3      A.   I am not sure.

4      Q.   Now, as an OSHA expert, where in the 1971

5   regulation which you provided for the deposition here

6   today or any OSHA regulation concerning asbestos,

7   does any of the rule making apply to salespersons as

8   opposed to any other workers?

9      A.   Well, OSHA applies to all employees, all

10   people in the labor workforce, whether they're in

11   sales, they're plumbers, carpenters, salespeople,

12   OSHA applies to all.

13      Q.   Okay.  OSHA also applies to employers,

14   product manufacturers; is that right?

15      A.   It applies to all employers in the safe

Case 5:13-cv-00826-FL   Document 263-3   Filed 11/24/15   Page 48 of 56

Exhibit 3 - 1118BerrymanDraft

16    working environment that they are charged with

17    providing for their employees.

18         Q.   So would you or would you not agree that

19    OSHA regulations applying to asbestos exposure also

20    applied in some way to product manufacturers?

21         A.   Well, as I said, OSHA strictly applies to

22    employers in providing a safe work being environment

23    for their employees.

24         Q.   Okay.  And you believe that if you have the

25    time to become more familiar with the asbestos


♀                                                      41


1     regulations from -- propagated by OSHA from 1971

2     forward, that you could be an expert on those OSHA

3     regulations as opposed to just OSHA generally; is

4     that correct?

5          A.   I consider myself to be an expert on OSHA,

6     but if you're asking me do I have it memorized every

7     time OSHA changed their fiber standards from 1971

8     forward, no, I don't have those dates memorized, I

9     don't have the details of that memorized.  I would

10    have to research those details, because there's just

11    too many of them, there's too many details that would

Page 48

Exhibit 3 - 1118BerrymanDraft

12    need to be memorized in order to answer all of the

13    questions that you have asked concerning history and

14    when their standards were changed concerning fiber

15    release.

16        Q.   Okay.  But you would agree that for your

17    opinion in this case, if there was an OSHA violation

18    by Larry Lee or any of the workers he was around

19    during the cutting of asbestos cement pipe, it would

20    be that the exposure levels were above the

21    permissible exposure levels or they were using

22    improper techniques; is that right?

23        A.   No.

24                  MR. BROWNING:  Objection.

25                  THE WITNESS:  Certainly the later.


♀                                          42


1         I mean, I am not speaking to -- in my report or

2         in my testimony in this matter, I am not speaking

3         one way or the other as to whether the fibers

4         that may have existed in the air at the time that

5         Larry Lee might have been around, whether they

6         exceeded permissible levels or not.


                        Page 49

Exhibit 3 - 1118BerrymanDraft

7             What I am speaking to is my

8       understanding of OSHA as a general contractor and

9       what's permissible and the use of a specific

10      piece of equipment to cut pipe as Larry Lee

11      described was used, and that that use of that

12      type of saw has he described it is contrary to

13      OSHA standards.

14          Q.   Okay.  Now, in this third opinion in

15   basis 3.1, you cite -- you indicate that Lee's

16   description of AC pipe being cut away with the saw

17   and this dust that blew up everywhere is contrary to

18   the work practices established by the AC Pipe

19   Producers Association; is that correct?

20          A.   Yes.

21          Q.   And can you tell us what the AC Pipe

22   Producers Association is?

23          A.   Yes.  It's a basically a trade organization

24   made up of asbestos cement pipe producers.

25          Q.   Okay.  And so some of those companies would

⚲                                                     43

1    includes Atlas Asbestos Company; is that correct?

2          A.   I am not sure.  I would have to look that up

                         Page 50

Exhibit 3 - 1118BerrymanDraft

3    to see if they were a member at that time.

4         Q.   Well, it's in the documents that you have

5    produced, specifically this manual.  If you turn to

6    page 20, and let me know when you're there, please.

7    Page 20 of the ACPPA manual?

8         A.   Yes, I have that.

9         Q.   Where it says AC pipe produced in

10   association of regular members, do you see that?

11        A.   Yes.

12        Q.   And it says, Canadian, Johns Manville

13   Company, correct?

14        A.   Yes.

15        Q.   And it says Cement Asbestos Products

16   Company; is that correct?

17        A.   Yes.

18        Q.   And the Certainteed Corporation?

19        A.   Yes.

20        Q.   And Johns Manville Sales Corporation, which

21   appears to be basically Johns Manville U.S.A.; is

22   that right?

23        A.   Well, it says Johns Manville Sales

24   Corporation.  That's what I'm reading.

25        Q.   Okay.  And you would agree that every

Page 51

Exhibit 3 - 1118BerrymanDraft

1        company on this list either sold asbestos to AC pipe

2        companies or were an AC pipe company who purchased

3        asbestos; is that right?

4                          MR. BROWNING:  Objection.

5                          THE WITNESS:  You don't know that

6            for sure.

7        BY MR. IOLA:

8            Q.    Okay.  What part of this ACPPA manual

9        applies to salespeople?

10           A.    I'm not sure what you mean when you say

11       "applies."

12           Q.    Well, if you look through the manual,

13       there's pages -- it says recommended work practices

14       for AC pipe, and it shows workers working with AC

15       pipe, proper cutting, proper machine techniques,

16       proper hole cutting.  Which of this applies to

17       salespeople?

18           A.    Well, I think these are the recommended work

19       practices for AC, pipe so anyone that would be

20       involved in working with AC pipe, I believe these are

21       the recommended practices that they should and did

Page 52

Exhibit 3 - 1118BerrymanDraft

22    follow.

23         Q.   So it's your position that Mr. Lee, as a

24    salesperson, was involved in the work of AC pipe?

25         A.   I don't think he had any testimony where he

♀                                        45

1    said that he held the pipe, cut the pipe.  So he's

2    not doing anything with the pipe.  The standard

3    practices of working with the pipe just wouldn't come

4    into play as far as he is concerned him personally.

5         Q.   Okay.  So you -- do you have any evidence,

6    as you sit here, that Mr. Lee would have received any

7    instruction about this manual or the manual itself?

8         A.   I don't know whether he did or didn't.

9         Q.   Do you have any knowledge as to whether this

10   ACPPA manual was created for the purpose of defending

11   against lawsuits from plaintiffs with mesothelioma

12   and other asbestos-related diseases?

13                    MR. BROWNING:  Objection.

14                    THE WITNESS:  I don't know

15         anything about that.

16   BY MR. IOLA:

17         Q.   Do you have any evidence, as you sit here,

                          Page 53

Exhibit 3 - 1118BerrymanDraft

18      that Mr. Lee received any instruction about OSHA

19      standard or any information from this ACPPA manual?

20          A.   No, I don't have any evidence of that.

21                  MR. IOLA:  I think those are all

22      of my questions.  If I can just have 30 seconds

23      to review my notes.

24                  Okay.  Those are all of my

25      questions.  I would just like to reserve on the


♀                                    46

1       record the opportunity to redepose Mr. Berryman

2       if he offers any additional opinions not

3       contained in his report, or if he reviews any

4       additional documents before trial.  I appreciate

5       your time, Mr. Berryman.  Thank you.

6                  THE WITNESS:  Thank you.

7                  MR. BROWNING:  I have nothing

8       further.

9                  THE WITNESS:  Ryan, do you think I

10      could get a copy of that to read and sign.

11                 MR. BROWNING:  Yeah, absolutely.

12                 (The deposition concluded at 4:05 p.m.)

Page 54

Exhibit 3 - 1118BerrymanDraft

13

14

15

16

17

18

19

20

21

22

23

24

25

♀